[Crim. No. 21498. Second Dist., Div. Five. Oct. 25, 1972.]

In re HENRY G., A Person Coming Under The Juvenile Court Law.
KENNETH E. KIRKPATRICK, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
HENRY G., Defendant and Appellant.

## COUNSEL

Richard S. Buckley, Public Defender, John J. Gibbons, Donald M. Gindy and Laurance S. Smith, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Frederick R. Millar, Jr., and John R. Evans, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

COLE, J.*—Appellant appeals from an order of the juvenile court finding him to be a person falling within section 601 of the Welfare and Institutions Code[1] and deeming him to be a ward of the court. The appeal is also "from all orders made by said Court adverse to HENRY G . . ." but no other such orders appear.

---

*Assigned by the Chairman of the Judicial Council.
[1]Unless otherwise indicated all statutory citations are to that code.

The petition under section 601 as originally filed charged that: "Said minor is beyond the control of his mother with whom he resides, in that: On November 14, 1971, minor became engaged in a physical altercation with his mother; on November 14, 1971, November 13, 1971, November 12, 1971 and many previous occasions minor remained away from home without permission until a late and unusual hour."

At the conclusion of the jurisdictional hearing the temporary judge ordered the petition modified to read: "Said minor is beyond the control of his mother with whom he resides, in that: On November 14, 1971, minor became engaged in a physical altercation with his mother; on ~~November 14, 1971, November 13, 1971, November 12, 1971~~ some ~~and many previous~~ occasions minor remained away from home without permission until a late and unusual hour," and as modified found the allegations to be true and sustained the petition.

Appellant earnestly and capably mounts an attack on the constitutionality of section 601.[2] His basic argument is that the statute is void for vagueness when applied to conduct of the type charged against him. He also urges that a second constitutional defect is found in its overbroadness. Respondent, with equal earnestness and capability, defends the constitutionality of the section.

While we cannot say, as did the court in *In re David S.,* 12 Cal.App.3d 1124, 1126 [91 Cal.Rptr. 261], with respect to similar contentions, that "fortunately, none of these issues are directly before us" we can and do find it unnecessary to decide the constitutional issues presented by the parties.

It is elementary that a court will not decide a constitutional question unless absolutely necessary and ". . . even though a constitutional question may be legitimately presented by the record, if the record also presents some other and satisfactory ground upon which a court may rest its judgment and thereby render the constitutional question immaterial to the case, that course will be adopted, and the question of constitutionality will be left for consideration until the case arises which cannot be adjudi-

---

[2]The section reads: ¶ "Any person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his parents, guardian, custodian or school authorities, or who is beyond the control of such person, or any person who is a habitual truant from school within the meaning of any law of this state, or who from any cause is in danger of leading an idle, dissolute, lewd, or immoral life, is within the jurisdiction of the juvenile court which may adjudge such person to be a ward of the court."

At the time of the juvenile proceeding in this case the age set forth in the statute was 21.

cated without considering it. . . ." (*People* v. *Barton,* 216 Cal.App.2d 542, 546 [31 Cal.Rptr. 7].) An "other and satisfactory ground" appears in this case in the other principal contention raised by appellant. Therefore we do not reach the constitutional question.

This other contention is that the evidence presented to the temporary judge was insufficient to justify a finding that he is a person beyond the control of his mother. Ancillary to this contention is appellant's point that he was improperly prevented from introducing evidence. These two contentions, taken together, are well founded and require a reversal of the order.

### *Facts*

The only witness to testify against appellant was his mother. Whether due to language difficulties, lack of comprehension, or plain non-responsiveness, her testimony is difficult to understand. We must, of course, indulge in all reasonable inferences to support the findings of the juvenile court. (*In re Rita P.,* 12 Cal.App.3d 1057, 1060 [95 Cal.Rptr. 430].) So doing, and tested by the proper standard, the findings do not find support in the evidence.

Henry was 16 years old at the time of the hearing. The mother's testimony was that she had been having many difficulties with her son; that he "hit me again after I bring him to court the first time" and that this was about three weeks previously when he kicked her on the side of her right ankle and slapped her on the inner side of the right wrist.

For the limited purposes of showing "a plan of action, modus operandi," that Henry was beyond her control the temporary judge let the mother answer that her son had struck her about five times before. She also testified that she told him he must come home by 10 o'clock and that he came home after that hour at about 2 or 3 o'clock in the morning. When asked how many specific times she recalled within the last month when this happened, she non-responsively answered "About two weeks, a week and a half; 1:00, 2:00 and 3:00 o'clock in the morning." Her final testimony on direct examination was that when he came home Henry said he was in his friend's house, "that he wasn't doing nothing bothering" and that he would not tell her where he was.

The mother's testimony on cross-examination was confusing as to dates. She first testified that Henry hit her on one occasion recently on her right ankle and her right arm. This, apparently, was on an evening when Henry's friend Carlos was there. She told Carlos to leave the house. The

transcript reads as indicated in the margin.[3] She also testified that she went to sleep at about 10:30 and woke up at a quarter to two or twenty-five to two when Henry returned.

The public defender was blocked in his efforts to inquire whether Henry had a girl friend. The temporary judge ruled that this was irrelevant in face of the allegation that Henry's mother told him to be home at 10 o'clock. Counsel then tried to pin the question down to a certain date. He asked the mother whether she recalled specifically the date that Henry came in "after 1:00 o'clock or a quarter to two?" and she answered "No."

Apparently with reference to other occasions than the date mentioned in the modified petition, the mother was asked whether Henry ever told her where he was going. She answered "To a friend's house." She said that the name Kathy was mentioned by Henry. An attempt to discover Kathy's last name was objected to as irrelevant and the objection was sustained. The mother also testified that Henry never told her where he goes; that sometimes Henry said he went to a playground; that sometimes he goes to South Gate Park and that a very few times he said that he was going to play basketball. The temporary judge blocked inquiry as to whether Henry belonged to a basketball team at high school. The mother testified, also under cross-examination, that she had a dispute with Henry over his loud stereo playing, and that she blamed Henry for her separation

---

[3]"Q. Did you tell Carlos and Henry to leave the house at some point?
"A. No. I told Carlos to leave the house and Henry hit me because I told Carlos that.
"Q. Did Henry start to leave the house?
"A. He left with him.
"Q. Did Henry start to leave the house?
"A. He leave when I told him that I am going to call the policeman and he ran away on the bicycle.
"Q. And before he ran away. did you grab him?
"A. No.
"Q. You never pulled him by the hair?
"A. I did once.
"Q. You did once?
"A. Once.
"Q. And while you were pulling him by the hair, did you also strike him?
"A. No.
"Q. Did you grab a whole hunk of hair and pull it?
"A. Oh, no. On one occasion that he hit me I guess I went like this to him, but I never did like bringing the hair out.
"Q. But you deny that you struck him at that time; is that right?
"A. No.
"Q. Did you strike him shortly after that?
"A. No, because he ran away.
"Q. He left that night?
"A. Yes."

from her husband. With reference to having previously filed charges against Henry, she stated that the case had been dismissed.

Henry testified that on the night in question he started to leave the house with his friend when his mother tried to prevent him by pulling his hair and that he pulled her hand away. He stated that he had never made a fist toward her, that he acted involuntarily in self-defense, and that his mother was using a very shrill voice. He then went to his girl friend's house. He had had other arguments with his mother in the past. She was constantly threatening to call the police. Henry testified that he tried four times to call home but the phone was busy or off the hook. His counsel was prevented from asking him whether there had been any incidents between Henry's mother and his sisters. Despite an offer of proof that "I am trying to show the hostility and the nervousness and the anxiety of the woman with regard to the children in the house, not specifically him," an objection was sustained, the court ruling the question to be irrelevant.

With this skimpy testimony the allegations of the petition as modified by the temporary judge were sustained.

The social study prepared by the probation officer was then read by the temporary judge. It recommended that Henry be made a ward of the court and be permitted to remain in his mother's home under the care and supervision of the probation officer. It pointed out that he was a young man of better than average intelligence, who did well in school and had no drug or truancy problem. While there were indications of incorrigibility, the probation officer concluded after interviewing all interested parties that there was "some question as to just how much at fault the minor is and how much of it is brought upon by the minor's mother."[4]

### Evidentiary Standards

We proceed then to a consideration of the standards which determine the sufficiency of the evidence to sustain a finding that a minor is a person described within section 601.

In the case of *In re David S., supra,* 12 Cal.App.3d 1124, 1127-1128, the court said: "It is clear that a single instance of conduct is sufficient to make a minor subject to the jurisdiction of the juvenile court pursuant to Welfare and Institutions Code section 602, which refers to persons under the age of 21 who violate a law of this state. [Footnote and citation

---

[4]Of course the social study could not properly have been considered by the temporary judge prior to his conclusion of the jurisdictional hearing and his finding that the allegations of the petition were sustained. (*In re Gladys R.,* 1 Cal.3d 855 [83 Cal. Rptr. 671, 464 P.2d 127]; §§ 701, 702, 706.)

omitted.] However, section 601 proscribes an area of conduct that does not involve violation of any law of this state, but the complex and difficult area of defining the possibilities for official intervention in the lives of children who have committed an act that would not be a crime if committed by an adult. As our Supreme Court recently suggested that the most acceptable function of section 601 may be the placement of youths who are not covered by section 602 [citation], its provisions must be construed with particular care. Furthermore, if the standards of conduct proscribed by section 601 are not carefully delineated, the statute could become a means of systematic discrimination against young people who are thereby denied equal protection of the law [citation].

". . . Significantly, the language of the statute is in the disjunctive. The phrase 'persistently or habitually' precedes the phrase 'refuses to obey the reasonable and proper orders or directions of his parents,' and is set off by a comma from the next phrase, 'or who is beyond the control.' Thus, the Legislature envisioned that while the first sentence of the statute requires repeated refusals on the part of the minor to obey his parents, etc., a single act, *if sufficiently serious,* would indicate that the minor was 'beyond control.' " (Italics supplied.)

And, the court said in *In re D.J.B.,* 18 Cal.App.3d 782, 786 [96 Cal. Rptr. 146]: "Although a single instance of conduct is sufficient to make a minor subject to the jurisdiction of the juvenile court where he violates a law or fails to obey a lawful order of the court after he has been found to be a person described in section 601 [citations], this rule does not necessarily apply to proceedings pursuant to section 601 where the standards of conduct are not carefully delineated. [Citations.]"

In *In re David S., supra,* the court upheld a finding that a minor was beyond the control of his parents. In that case a 14-year-old deliberately lied to his mother and obtained her permission to spend a weekend with friends at a beach 40 miles from his house. He fully intended to go to Mexico and was picked up in San Diego at the Mexican border, some 600 miles from his house.

In *In re D.J.B., supra,* the court reversed a finding that a minor was beyond the control of her father because she left his home without his consent on one specific day. It was ruled that as a matter of law such evidence was insufficient to support a finding of jurisdiction under section 601.

The facts of this case, recited at length above, seem to us to fall in between those of *In re David S.* and *In re D.J.B.*

Are they, then, "sufficiently serious" to bring the minor within the purview of the section? A fair reading of the transcript of the hearing indicates that the conduct in question essentially occurred on one evening. It was then, apparently, that the minor "struck" his mother when she physically tried to prevent him from leaving the house and it was then that he stayed out beyond her 10 o'clock curfew. The only allegation of the petition, as modified, which could be deemed to relate to any other time is found in the temporary judge's modification that on "some occasions" the minor remained away from home without permission. The allegation is supported, if at all, only by the following testimony:

"Q. BY MR. ROSS: Can you recall any specific times when you told your son to come home at 10:00 o'clock and he came home at a later time?

"A. Yes.

"Q. How many specific times do you recall within the last month?

"A. How many?

"Q. Yes.

"A. About two weeks, a week and a half; 1, 2 and 3 o'clock in the morning."

". . . . . . . . . . . . . . . . . . .

"Q. BY MR. GINDY: You have told us that Henry has gone out after 10 o'clock; is that right?

He has been gone after 10 P.M.?

"A. Yes.

"Q. Does he ever tell you where he is going to go?

"A. To a friend's house."[5]

Given the serious consequences of a finding that a minor is within section 601,[6] that flimsy statement cannot brand Henry as being beyond the control of his mother.

---

[5]It is impossible to determine whether the testimony last quoted above related to November 14, 1971, the date upon which it was found that the minor engaged in an altercation with his mother, or to some other date.

[6]Children found subject to section 601 are delinquent. (*In re Gladys R., supra.* 1 Cal.3d 855, 865.) A function of the section is the placement in a proper environment for correction of those not covered by section 602. *Ibid.* Even though the section 601 minor has not committed what would be an adult crime the fact that he is a delinquent seems to us to stigmatize him in adult life almost as much as would the fact of a section 602 determination. (See *In re Gladys R., supra,* at p. 866, last paragraph of fn. 21.) A minor adjudged a ward of the court under section 601 may not be sent

This is particularly so when it is remembered that Henry's counsel was prevented by the court from attempting to establish the relationship which existed between the mother and all of her children in the house as well as being prevented from asking whether Henry may have gone to a girl friend's house or played basketball on some occasions.

The inquiry allowed when a minor is charged with being beyond the control of his parents must be a broad one. If, in connection with the normal frictions of family life, the minor is so disobedient as to warrant sustaining a petition under section 601 he is branded as a delinquent (see fn. 6, *supra*). If, on the other hand, (as the social study herein indeed later pointed out might be the case) the breakdown in parental control is because of failings in the parent rather than in the minor, a section 601 petition could not be sustained. Given the identical complaints by a mother, against a son, if it was determined that she was the one who has lost control, a dismissal of section 601 charges would follow. A finding that the parent was at fault might support the determination that the minor was within section 600,[7] but that section deals with dependent children in need of help not with delinquent children in need of correction. ■ We do not at all intimate that Henry's mother was the one at fault but his counsel should have been allowed to try to show that fact. Precluding the attempt might well create a situation where the "beyond the control" provisions of section 601 are used to avoid the more stringent language of that section relating to one who persistently or habitually refuses to obey a parent's reasonable and proper orders or directions.[8]

to the California Youth Authority as is "possible under section 602. Otherwise, however, a 601 case is not treated too differently from a 602 case." (*In re David S., supra,* 12 Cal.App.3d 1124, 1127, fn. 5.)

[7]"Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court.

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control. . . ."

[8]The People rely on a Massachusetts decision, *Commonwealth* v. *Brasher* (Mass.) 270 N.E.2d 389, for the self-evident proposition that the state has an obvious interest in insuring the existence of harmonious relationships between family members and thus may take action to insure the proper functioning of a family unit as an important segment of society. Adopting this concept wholeheartedly, we note that in upholding against constitutional attack a Massachusetts statute punishing criminally a minor who is a "stubborn child" the court required that among the elements to be proved is that the child wilfully, obstinately, and persistently for a period of time refused to submit to the lawful and reasonable commands of a parent. The court stated that: "Single, infrequent or isolated refusals to obey such commands do not constitute a crime. Neither do manifestations of stubbornness which do not amount to refusals to obey commands." (P. 393.)

In *People* v. *Allen,* 22 N.Y.2d 465 [293 N.Y.S.2d. 280, 239 N.E.2d 879], the New York Court of Appeals pointed out that while the constitionality of the New York statute dealing with juveniles ("wayward minor" in the New York terminology) had been upheld, ". . . in view of the tightening of due process requirements in this type of juvenile proceeding authorizing the judicial option of confinement in institutions which serve also for the treatment of persons convicted of felony, particular care should be taken that the charge has substance based on acts which point to grave danger to youth and is not merely a compliance with form; and that the conduct inquired into is seriously harmful and not merely an exaggerated manifestation of intra-family parent-child conflict." This seems to us to be a sensible manner in which to weigh the sufficiency of the evidence. Applied to the instant case this record shows at best "an exaggerated manifestation of intra-family parent-child conflict," and maybe not even that much.

We do not mean to minimize the importance of the fact that there was physical violence between Henry and his mother. The Fourth Commandment is still an integral part of the beliefs of our society. It is one thing, however, to say that a teen-age minor has struck his parent—it is another thing if that striking is done in self-defense and in response to traumatic situations initiated by the parent.[9] Not enough leeway was allowed here to inquire into that situation and, therefore, we reverse the order.

Kaus, P. J., and Aiso, J., concurred.

A petition for a rehearing was denied November 10, 1972, and respondent's petition for a hearing by the Supreme Court was denied December 20, 1972.

---

[9]The temporary judge expressed the view that he was inclined to send Henry to camp "because I don't think the boy should hit his mother for any reason, none at all. All a boy should do, if a mother hits him, is to run away and never raise a hand to hit her."