*In re* WALTER POLOVCHAK, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* ANNA POLOVCHAK *et al.*, Respondents-Appellants.)

First District (3rd Division)    No. 80-2857

Opinion filed December 30, 1981.—Rehearing denied March 23, 1982.

Mandel, Lipton and Stevenson, Ltd., of Chicago (Richard L. Mandel, Steven Lubet, and Harvey Grossman, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, Richard Michael, and Maurice M. Dore, Assistant State's Attorneys, of counsel), for the People.

Julian E. Kulas, of Chicago, and Henry Mark Holzer, of New York, for Walter Polovchak.

JUSTICE McGILLICUDDY delivered the opinion of the court:

On August 4, 1980, pursuant to the procedures set forth in the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 701—1 *et seq.*), Walter Polovchak (Walter) was declared a minor in need of supervision and was adjudged a ward of the court. A dispositional hearing was scheduled for November 5, 1980. However, on November 5, 1980, in accordance with Supreme Court Rule 662 (Ill. Rev. Stat. 1979, ch. 110A, par. 662), Walter's parents, Michael and Anna Polovchak (the Polovchaks), appealed from the order of August 4, 1980.

On appeal, the Polovchaks raise the following issues: (1) whether the adjudication of wardship was an unconstitutional interference by the State into the sanctity and privacy of the family; (2) whether the Illinois minor in need of supervision (MINS) statute (Ill. Rev. Stat. 1979, ch. 37, par. 702—3) was unconstitutionally vague; (3) whether the adjudication of wardship proceedings violated their constitutional and statutory rights to a trial; and (4) whether the evidence adduced at the hearing was sufficient to adjudicate Walter a ward of the court.[1]

Michael and Anna Polovchak and their three children arrived in the United States from the Soviet Ukraine in January of 1980. On July 14, 1980, Walter, then age 12, left his parents' home with his sister, Natalie, age 17. On July 18, 1980, Michael Polovchak enlisted the help of the Chicago police to find his son. Youth officers found Walter and Natalie at the apartment of their cousin, Walter Polovczak (the cousin). Petitions for adjudication of wardship in which Walter and Natalie were alleged to be beyond the control of their parents and thus minors in need of supervision were filed; and an adjudicatory hearing was held to determine whether the allegations in the petitions were supported by the evidence.

The adjudicatory hearing began with the entry of admissions by Walter and Natalie[2] that they were minors in need of supervision. After the trial judge determined that the admissions were freely and voluntarily given, additional evidence was presented by the State and the Polovchaks.

---

[1] The State argues that the Polovchaks should be estopped from bringing this interlocutory appeal pursuant to Supreme Court Rule 662 (Ill. Rev. Stat. 1979, ch. 110A, par. 662) because the Polovchaks agreed to the delay in the dispositional hearing. The rule provides in part:

> "(a) Adjudication of Wardship. An appeal may be taken to the Appellate Court from an adjudication of wardship in the event that an order of disposition has not been entered within 90 days of the adjudication of wardship."

The State raised this same issue in its motion to dismiss this appeal. As the motion was denied by this court, we will not address that issue in this opinion.

[2] This appeal is not concerned with the finding adjudicating Natalie a ward of the court. She is no longer a minor under the Juvenile Court Act.

Anna Polovchak testified that on July 14, 1980, at about 4 p.m., she returned home from work and saw Natalie and Walter removing their belongings from the family apartment. They were being helped by their cousin Walter and by two other men. Her son refused to tell her where he was going.

Walter Polovczak, the cousin, testified that he resided with the Polovchaks until July 12, 1980 when he moved into his own apartment. On Sunday, July 13, he drove Natalie and Walter to church and they spent the night at his apartment. The following day he returned to the Polovchak residence with his cousins and two friends to remove his belongings. At that time, Natalie and Walter proceeded to remove their belongings also. When Anna Polovchak arrived, he told her that her son was not being forced to do anything and that Walter was going with Natalie. Walter and Natalie stayed with their cousin until Friday, July 18, the day the police arrived. The cousin admitted that he never informed his aunt and uncle where Natalie and Walter were living. He did not have the parents' permission to take their children to his apartment. He denied that he influenced Walter, and stated that Walter wanted to stay with Natalie.

Natalie Polovchak testified that on Saturday, July 12, her father argued with her cousin and accused him of taking Walter away. The next day Natalie and Walter went to church with their cousin, and she asked to be taken home so that she could get her belongings. Walter did not go with her. When she left her parents' apartment, her father followed her to the bus stop and said "ugly words." Natalie returned to her cousin's apartment and questioned her brother about his intentions. Walter told her that he did not want to return to his parents and that he wanted to stay with her.

Natalie further testified on cross-examination that her parents told her of their intention to return to the Ukraine. She did not want to accompany them so they did not apply for readmission for her. On several occasions her parents told her not to take Walter with her.

Walter Polovchak, the minor, testified that on July 13, 1980, he had gone to church with his cousin and Natalie. After church his cousin drove Natalie home to get some clothes. He stayed with his sister and cousin, at the cousin's apartment, on Sunday night and went with them to his parents' apartment on Monday. Walter testified that after he packed his belongings, his mother arrived. When she questioned him, he told her that she should not be concerned.

On cross-examination Walter stated that his cousin offered to help him if he did not want to return to the Ukraine. He testified that he left his parents because he did not want to return to the Ukraine and because his parents did not talk to him. Walter stated that if he had not gone to live with his cousin he would have gone elsewhere. Walter testified that he

would not return home if the petition for adjudication of wardship was dismissed.

Michael Polovchak stated that Walter had not presented any problems until he told Walter of his intention to return to the Ukraine. Michael testified that he wanted Walter to return to the Ukraine so that the family could be together, "for the love of a child," and because he was responsible for Walter.

Chicago Police Sergeant Leo Rojek, acting commander of Area 5 Youth, testified that on July 18, 1980, Michael Polovchak came to the police station with an interpreter and informed the police that his son was gone. Walter was found at his cousin's apartment and was brought to the police station. Walter said he had run away because he did not want to return to the Ukraine with his family. The police then telephoned the United States Immigration and Naturalization Service and Department of State and were instructed not to return Walter to his parents. Thereafter, Walter was processed as a minor in need of supervision.

The Polovchaks recalled Walter to the stand and questioned him regarding his life in the Ukraine. Walter testified that while he lived in the Ukraine his parents provided him with food and clothing and made sure he went to school. He did not like the Ukraine because "there aren't many things to be bought there." Walter reiterated that he left his parents to avoid returning to the Ukraine.

Doctor Ner Littner, a child psychiatrist, testified for the Polovchaks. After having been qualified as an expert witness, Dr. Littner was asked the following hypothetical question:

"Dr. Littner, based upon your experience as a child psychiatrist, and based upon your experience involving parent-child relationships, and based upon the following facts: that Walter's decision to leave home was based upon the fact that his parents had decided to go back to the Ukraine; that his cousin Walter was willing to allow him to live with him; that his cousin Walter and his sister Natalie assisted Walter in leaving his parents' home; since leaving Walter has resided with his 24 year old cousin and his 17 year old sister; that Walter's parents love him; that Walter's parents have never physically or emotionally harmed him; that Walter's parents' decision to return to the Ukraine is based on their desire to do what is best for the Polovchak family; that cousin Walter who lived with the Polovchaks told Walter that if Walter did not return, Walter could live with him.

Now, based upon those facts, do you have an opinion based upon a reasonable degree of medical certainty as to whether Walter's parents can control him despite Walter's desire to remain in the United States?"

Doctor Littner responded to this question by stating that, in his opinion, Walter's parents could control him since Walter's actions were indicative of defiance and rebellion rather than independent judgment. He stated that, if Walter's cousin and sister were not present, Walter may have locked himself in a room to manifest his rebellion against his parents. Doctor Littner testified that, based on the hypothetical, Walter was not a runaway because he made certain that his parents knew where he was. He stated that no 12-year-old has the intellectual or emotional capacity to decide whether he should live with his parents and concluded that Walter's continued separation from his parents would be harmful.

On cross-examination Doctor Littner discussed the importance of mothering and fathering and said that a child should not be removed from his parents absent physical or sexual abuse. He stated that a 12-year-old could compare living standards but does not have the maturity to determine where he should live. Doctor Littner testified that he had not talked to Walter or the Polovchaks and did not know the background of their family relationships.

In rebuttal the State called Doctor Robert Bussell, Director of Clinical Services for the Juvenile Court. In response to a hypothetical question similar to the one posed to Doctor Littner, Doctor Bussell concluded that Walter would not be irreparably or emotionally harmed if he remained away from his parents. He testified that 12-year-olds can make fairly good decisions concerning their welfare, what they want to eat and how they want to dress, and usually have some ideas about the direction of their lives. Doctor Bussell said that a 12-year-old who has lived in the Ukraine and in the United States would be able to determine differences in quality of life and would be able to form a preference for one place over the other.

Doctor Bussell further testified that Walter's parents could control him despite Walter's desire to remain in the United States because of their physical differences but expressed some concern about their ability to rear Walter in the Ukraine. He had no opinion on the long-term effects on Walter if he was removed from his parents because he did not know Walter.

Following arguments, the trial judge entered a finding that Walter and Natalie were minors in need of supervision and adjudged them to be wards of the court.

Section 2—3(a) of the Juvenile Court Act (the Act) defines a minor otherwise in need of supervision as, *inter alia*, "any minor under 18 years of age who is beyond the control of his parents, guardian or other custodian." (Ill. Rev. Stat. 1979, ch. 37, par. 702—3(a).) Allegations that a minor is otherwise in need of supervision must be proven at an adjudicatory hearing by a preponderance of the evidence. (Ill. Rev. Stat. 1979,

ch. 37, pars. 701—4, 704—6.) If the court finds that the minor is a person in need of supervision and that it is in the best interest of the minor and the public that he be made a ward of the court, the court shall adjudge the minor a ward and proceed to a dispositional hearing. Ill. Rev. Stat. 1979, ch. 37, par. 704—8(2).

At proceedings under the Act, the minor and his parents have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records, and to be represented by counsel. (Ill. Rev. Stat. 1979, ch. 37, par. 701—20.) The Polovchaks argue that they were denied their right to a trial to contest the issue of whether Walter was beyond their control. They contend that the trial judge, in reliance on Walter's admission that he was beyond his parents' control, conducted a summary proceeding limited to the issue of whether there was a factual basis for the admission. The Polovchaks argue that the trial court did not weigh the evidence under the preponderance of evidence standard required by sections 1—4 and 4—6 of the Act (Ill. Rev. Stat. 1979, ch. 37, pars. 701—4, 704—6) and that, had the trial court applied the appropriate standard, it would not have concluded that Walter was beyond their control.

A review of the record shows that the trial judge did state that he was going to conduct a hearing to determine whether a factual basis for the plea existed. The record further shows, however, that the judge preceded this remark with a statement that the hearing was an adjudicatory hearing. Under the Act, the term "adjudicatory hearing" implies "a hearing to determine (a) whether the allegations of a petition * * * that a minor is otherwise in need of supervision, * * * are supported by a preponderance of the evidence * * *." (Ill. Rev. Stat. 1979, ch. 37, par. 701—4.) After Walter's admission was entered, the State did in fact proceed with the presentation of evidence and recognized that its burden of proof was to be measured by the preponderance of the evidence standard.

We believe that the judicial comments highlighted by the Polovchaks should not be taken out of context. The record, viewed in its entirety, shows that a full and complete evidentiary hearing was conducted. All of the parties testified and were allowed to present witnesses and conduct thorough cross-examinations. The record does not reflect, nor do the Polovchaks contend, that they were prevented from presenting any evidence.

■■ Clearly, no material facts were in dispute. The minor absented himself from the family residence, without his parents' consent and without informing them of his whereabouts. The basis for this absence was the minor's disagreement with his parents' decision to return to the Ukraine. At the conclusion of the hearing, the trial judge found that Walter was a

minor in need of supervision because he was beyond the control of his parents. He adjudged Walter to be a ward of the court "based upon all of the evidence that I have heard." We believe that the trial judge weighed all of the evidence presented according to the required legal standards and conclude that the Polovchaks received a full, fair and proper hearing.

The Polovchaks also contend that the adjudication of wardship was improper under any standard of proof. They argue that Walter's single and isolated absence from the home was harmless misbehavior, insufficient to support a finding that he was beyond their control and insufficient to warrant State intervention into their family affairs.

It is well settled in this country that parents have the primary role of providing for the care and nurture of their children. (*H. L. v. Matheson* (1981), 450 U.S. 398, 67 L. Ed. 2d 388, 101 S. Ct. 1164; *Wisconsin v. Yoder* (1972), 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526; *In re Martin* (1975), 31 Ill. App. 3d 288, 333 N.E.2d 711.) However, the State as parens patriae may restrict the parents' control and freedom in this regard where the welfare of the child is at issue. (*Prince v. Massachusetts* (1944), 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438.) Acting within this legitimate interest, to provide for the care and guidance of minors subject to the Act, the State of Illinois enacted its Juvenile Court Act. (*Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208.) A primary goal of the Act is to preserve and strengthen the minor's family ties whenever possible. Ill. Rev. Stat. 1979, ch. 37, par. 701—2.

In the case at bar the State contends that Walter was a minor subject to the Act because he was beyond his parents' control and because his welfare was in serious jeopardy. The State argues that Walter was a runaway and needed to be protected by the State from the considerable dangers existent to all runaways.

The term "beyond the control" is not defined in the Illinois Juvenile Court Act and has not been construed by the courts of this State. In California, a single act can establish that a minor is beyond the control of his parents or guardian (*In re S.* (1970), 12 Cal. App. 3d 1124, 91 Cal. Rptr. 261) provided the minor's conduct is seriously harmful and not merely an exaggerated manifestation of intrafamily parent-child conflict. (*In re G.* (1972), 28 Cal. App. 3d 276, 104 Cal. Rptr. 585.) The applicable statute in California provides for the adjudication of wardship of a minor "who persistently or habitually refuses to obey the reasonable and proper orders or directions of his parents, * * * *or* who is beyond the control of such person * * *." (Emphasis added.) (Cal. Welf. & Inst. Code §601 (West 1972).) Finding that the language of the statute was in the disjunctive, the court in *In re S.* held that repeated acts of disobedience were

required under the first clause of the statute, while a single act could be sufficient under the second clause.[3]

■■ The Illinois MINS statute requirement that the minor be beyond the control of his parents is similarly worded to the California statute.[4] Therefore, a single isolated act by a minor in Illinois can be sufficient to establish that the minor is beyond the control of his parents provided the minor's conduct is seriously harmful and points to grave danger. However, in the instant case Walter's action was not sufficiently serious to warrant a finding that he was beyond his parents' control.

It is undisputed that Walter committed a single act of misbehavior by absenting himself from the family residence for five days because he did not want to return to the Ukraine. Walter remained with his older sister and cousin at the cousin's apartment. Both expert witnesses agreed that, based on a hypothetical reflecting the facts in the case at bar, Walter was not beyond his parents' control. Doctor Littner testified that Walter's actions were acts of immature rebellion. In his opinion, Walter would not have manifested this rebelliousness by running away from home but for the fact that his cousin and sister provided him with alternative shelter. Doctor Bussell, while expressing some doubt as to the ability of the Polovchaks to rear Walter in a country that he did not wish to return to, concluded, however, that the Polovchaks could physically control Walter.

We believe that Walter's health, safety and welfare were not jeopardized when he absented himself from the family residence. Walter was in no physical or mental danger as his needs were being met by his sister and cousin. Viewed in its simplest terms, the situation presented in the instant case is one of family discord caused by a child's disagreement with his parents' decision to return to their homeland. We have serious doubt as to whether the State would have intervened in this realm of family life and privacy had the parents' decision to relocate involved a move to another city or State. The fact that the parents had decided to move to a country which is ruled under principles of government which are alien to those of the United States of America should not compel a different result.

Whether the minor may be entitled to political asylum in this country is an issue that should be decided by another forum. The Illinois MINS statute should not be utilized as a subterfuge to achieve such a result.

■■ We hold that, under the facts presented, the trial court's determination that Walter was beyond the control of his parents was against the

---

[3] *Cf.* N.Y. Fam. Ct. Act §712(b) (McKinney 1975) (a person in need of supervision is, *inter alia*, a minor who is "habitually disobedient *and* beyond the lawful control of parent ° ° °" (emphasis added)). As the New York statutory language is conjunctive, habitual misconduct is required in that State to sustain a petition alleging a person to be in need of supervision. See *In re R.* (1973), 73 Misc. 2d 390, 341 N.Y.S.2d 998.

[4] In Illinois, as in California, "beyond the control" is not preceded by phrases such as "persistently" or "habitually."

manifest weight of the evidence. Walter's single act of leaving the family residence after learning of his parents' decision to return to their homeland was an exaggerated manifestation of parent-child conflict (*In re G.*) and was not sufficient to bring him within the jurisdiction of the court. We further find that Walter, having gone to live with his sister and cousin, was not placed in a situation of grave danger such that he required care and guidance from the State.

As a result of these conclusions, we find it unnecessary to address the second evidentiary issue of whether the adjudication of wardship was in the best interest of Walter or the public.

Since we hold that Walter was not subject to the jurisdiction of the court, we need not consider the constitutional issues raised by the appellant. Illinois courts will consider constitutional issues only where necessary to a disposition of the case. *Anundson v. City of Chicago* (1970), 44 Ill. 2d 491, 256 N.E.2d 1; *City of Chicago v. Abdullah* (1979), 76 Ill. App. 3d 325, 395 N.E.2d 50.

For the foregoing reasons, we conclude that Walter Polovchak was not a minor in need of supervision pursuant to section 2—3(a) of the Juvenile Court Act. Therefore, the judgment of the circuit court of Cook County is reversed.

Reversed.

WHITE, J., concurs.

JUSTICE McNAMARA, dissenting:

I respectfully dissent from the conclusion reached by the majority. In my view, the evidence adduced at the adjudicatory hearing was sufficient to establish that Walter was beyond the control of his parents, that he was in need of supervision and that he was properly made a ward of the court. A brief recitation of undisputed facts is sufficient to demonstrate the correctness of the juvenile court's decision.

After two attorneys, one appointed and one retained, entered admissions to the MINS petition, the juvenile court heard testimony that Walter, along with his sister who was also a juvenile, left home without his parents' permission. With his mother watching, Walter packed his belongings, including his bed, and moved out. He refused to disclose his destination and did not contact his parents after his departure. His parents knew that Walter was living in a cousin's apartment, but they did not know where the cousin lived. Four days after his departure, without having any contact with the boy in the interim, the parents asked the police to locate Walter. When the police found the boy, he refused to return home. At the hearing, Walter testified that he left home because no one talked to him and because he did not wish to return to the Ukraine.

Walter also told the judge that he would continue to run away if he were returned home. After making its decision that Walter was in need of supervision, the trial court expressed its concern that some harm would befall Walter if he continued to run away.

The foregoing evidence does not reflect an isolated act of normal, adolescent rebellion. Rather it demonstrates a boy clearly beyond the control of his parents. While his mother stood by, apparently unable to control the situation, Walter packed and left home. Several days later, still unable to control the situation, the parents were compelled to seek out the authorities in order to locate the boy. When the police found Walter, he still refused to return home. And in court, Walter stated that he would leave again if forced to return home. Under the circumstances, the juvenile court's concern for Walter's welfare was justified and its finding that he was in need of supervision was amply supported by the evidence.

The majority opinion erroneously relies upon the California case of *In re G.* to support its holding that there was insufficient evidence that Walter is beyond his parents' control. The reviewing court in *In re G.* did not make the general finding that the child was not beyond his parents' control but, rather, held that the trial court's erroneous restriction of questioning regarding to whom the lack of control could be attributed raised a question as to the applicability of one of two provisions in California's juvenile code. California law draws a dichotomy between children beyond parents' control due to the fault of the child, and children beyond the parents' control due to the fault of the parents. The *In re G.* case solely involved the issue whether the minor fell within the purview of the former section. Evidence had been presented that the minor struck his mother and then returned home past curfew. The trial court stated that questions were raised pertaining to the allocation of fault for the lack of control, but held that the child fell within the meaning of the former statutory provision. Unlike the law of California, our Illinois Juvenile Code creates one classification for children who are beyond their parents' control, and despite the allocation of fault, such children are deemed minors "otherwise in need of supervision." Applying the single standard of the Illinois statute, the evidence clearly shows that Walter was beyond his parents' control within the meaning of section 2—3 of the Act.

The suggestion that the juvenile court proceedings were a subterfuge to prevent Walter's return to the Ukraine is unwarranted. It ignores the compelling evidence that he was beyond his parents' control. It also ignores the assertions of the conscientious trial judge that he wished to effect a reconciliation of the family. The majority opinion also hypothecates that no court intervention would have occurred if the family merely wished to relocate in another area of this country. The opposite is true. I am convinced that in a matter where a boy fled home under circum-

stances such as these but because his family was moving to another State, a juvenile court's decision that supervision over the child was required never would be disturbed by a reviewing court. I believe that the trial court's holding in the present case was wise, proper, and supported by the evidence.

Since I believe that the MINS statute is constitutional, I would affirm the adjudication of the juvenile division of the circuit court of Cook County and remand the cause for a considered determination of a proper disposition.