[No. A047294. First Dist., Div. Two. Sept. 20, 1991.]

In re BETTYE K., a Person Coming Under the Juvenile Court Law.
SHIRLEY McISSAC, as Chief Probation Officer, etc., Plaintiff and
Respondent, v.
BETTYE K., Defendant and Respondent;
ELLIS K., Objector and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1(a), this opinion is certified for publication with the exception of part II.

**COUNSEL**

Violet Elizabeth Grayson for Objector and Appellant.

Louise H. Renne, City Attorney, Loretta M. Giorgi and Julia Ten Eyck, Deputy City Attorneys, for Plaintiff and Respondent.

Landels, Ripley & Diamond, Sanford Svetcov, Mariah Baird and Christopher N. Wu for Defendant and Respondent.

**OPINION**

**KLINE, P. J.**—Appellant Ellis K. challenges orders of the juvenile court subjecting his daughter Bettye K. to the jurisdiction of that court under

Welfare and Institutions Code section 601,[1] and ordering out-of-home placement. Appellant contends among other things that the challenged orders violated the Indian Child Welfare Act of 1978, 25 United States Code section 1901 et seq. (hereinafter cited as ICWA or the Act). Respondent Shirley McIssac, as Chief Probation Officer of the City and County of San Francisco, defends the orders, as does Bettye. We will affirm.

## I.

### Background

Bettye was born in Louisiana in July 1974 to appellant and his then-wife, Bettie R. Bettie R. is a member of the United Houma Nation, a self-described Indian tribe in Southern Louisiana. Bettye is also enrolled as a member of the Houma tribe.

After her parents separated in 1975 or 1976, Bettye lived at various times with her mother, her father, her mother and stepfather, her mother's parents, and her father's parents. At some point, due to poor health, Bettye's mother signed guardianship papers giving custody of Bettye to the paternal grandparents, and for some time thereafter she lived with Bettye in Louisiana.

In August of 1988 Bettye came to live with appellant in San Francisco. She testified that she wanted to come, but also that her grandparents wanted her to stay with her father and that he told her he had a decent place to live, it was just going to be the two of them, and everything would be fine. She thought her father had changed, in contrast to earlier times when he and one of her uncles took drugs.

In fact appellant was living in a "co-op" in San Francisco's Tenderloin neighborhood. While Bettye was there, the two of them shared his single room, sleeping in bunk beds. In the co-op there were "a lot of people doing drugs," and some of appellant's "friends," according to Bettye, encouraged her to get into drugs. Some of the residents would "sexually harass her," meaning they would "try[] to put their hands all over me . . . put their hands on me and like get away, you know. And they would get really, really, mad and start yelling at me if I wouldn't do what they wanted me to do." They never actually succeeded in putting their hands on her. When she complained to her father about these problems, "He said well that is the way they are, and, you know, just ignore it."

---

[1] Except as otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

In addition, Bettye testified without contradiction that her father "would drink all the time" and that when he drank he got into "real weird moods," being "very offensive about everything and act[ing] like he wanted to fight or something." "He would do stupid things like throw something out of the window and have it break in the street and laugh." She testified that the atmosphere was "really, really bad, you know, and he liked the atmosphere, he loved it."[2]

On the night of October 2, 1988, Bettye went to visit a friend. Her father called and said he was coming to get her. Bettye left her friend's house and spent the night wandering the streets before turning herself in to Huckleberry House, a center for runaways. On October 3, 1988, the supervising probation officer filed a petition under section 601, alleging that on the previous day Bettye "ran away from the paternal home" and "refuses to return to the paternal home" due to "irreconcilable differences with her father." On October 4, Bettye admitted this allegation and the juvenile court sustained the petition, finding jurisdiction under the cited statute. On October 12, she was declared a ward of the court and committed to the probation officer for out-of-home placement. After appellant took an appeal from that order, respondents apparently concluded that he had been deprived of significant procedural rights, notably the right to counsel. They thereupon moved successfully to dismiss the original petition, set aside all orders and findings, and file a new petition, which became the basis for the orders here under review. The pending appeal from the original order was dismissed as moot.

Bettye admitted the allegations of the second petition, and the juvenile court again found jurisdiction, rejecting appellant's contention that the ICWA deprived the court of power to make such an order. ■ Appellant filed a notice of appeal that same day from "the jurisdictional order."[3] Several

---

[2] This depiction of appellant appears entirely consistent with his conduct before this court. In the appeal of his related civil suit (No. A050313) he has filed a purported reply brief which would be stricken as scandalous and irrelevant if not for its tendency to corroborate Bettye's testimony and the trial court's findings here. On the cover sheet of this bizarre document, appellant describes himself as doing business under the name "Party of Life." Then appears the slogan, "Life Is a Party." In the following pages, religious symbols and allusions are mixed with ruminations on appellant's name, family history, and political notions. He states that he expects to be the next president of the San Francisco Board of Supervisors and that when this occurs he will establish an "Office of the Reefer Inspector for quality control to insure that we have good marijuana." He also announces a plan to start "a new organization and it is called Ass Holes Anonymous . . . and we will all sit around the table and get shit faced drunk and the twelve step program, the first premis [sic] will be 'I have power, I lift the glass to my lips and I drink.' " This tour de force of frivolous free association culminates in the postscript, "Those Cuban boys roll damn good cigars."

[3] Respondent contends the notice of appeal was ineffective to confer appellate jurisdiction because a jurisdictional order is nonappealable. However, the very cases cited by respondent

weeks later the juvenile court conducted a dispositional hearing, at the conclusion of which it ordered out-of-home placement, in effect a continuation of the foster home placement which had been in effect since some time after the original petition was sustained. On its own motion, the court then reopened the dispositional phase and conducted a further hearing to permit appellant to cross-examine Bettye and her probation officers, and to present such further evidence as he might choose. At the conclusion of this hearing the court again declared Bettye a ward and ordered out-of-home placement.

## II.

### Indian Child Welfare Act*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III.

### Jurisdictional Findings

To sustain the petition, the juvenile court had to find that Bettye was a "person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of [her] parents, guardian, or custodian, or who is beyond the control of such person . . . ." (§ 601, subd. (a).) There is no evidence here of persistent or habitual disobedience. Accordingly the order must rest on a finding that Bettye was beyond appellant's control. The requisite lack of parental control had to be shown by a preponderance of the evidence. (§ 701.)

In reviewing the evidence on this point, we must indulge all reasonable inferences in support of the juvenile court's findings, sustaining them if they are supported by substantial evidence. (*In re Rita P.* (1970) 12 Cal.App.3d 1057, 1060 [95 Cal.Rptr. 430].) We must view the evidence in the light most favorable to the trial court's ruling. (*In re Dennis B.* (1976) 18 Cal.3d 687, 697 [135 Cal.Rptr. 82, 557 P.2d 514].)

show that the defect in appellant's notice is not fatal. Rather, a notice purporting to appeal from jurisdictional findings will be deemed to refer to the subsequent dispositional order, assuming there is one. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112 [240 Cal.Rptr. 445]; *In re Jennifer V.* (1988) 197 Cal.App.3d 1206, 1209 [243 Cal.Rptr. 441].) Nor is it fatal that the notice of appeal is filed before the dispositional order is entered. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 412-414, pp. 410-413.) Accordingly we decline to dismiss the appeal. This renders moot appellant's pending motion to amend the notice of appeal.

*See footnote, *ante*, page 143.

Appellant asserts that "a single instance of running away" is insufficient to establish that Bettye was beyond control. He cites *In re Rita P.*, *supra*, 12 Cal.App.3d at page 1060, where the court reversed a declaration of wardship resting entirely on the minor's factual admission that she had refused to stay in one foster home. (*Id.*, at p. 1061, fn. 2.) The court noted that a single act of noncooperation did not establish a "persistent or habitual refusal to obey the reasonable and proper orders or directions of the custodian." (*Id.*, at p. 1060.) Here, however, the assertion of jurisdiction did not rest on persistent or habitual disobedience, but on Bettye's being beyond her father's control. Moreover, the minor in *Rita P.* objected to the declaration of wardship and sought placement with relatives. The analysis applied in *Rita P.* is therefore inapposite.

Appellant also cites *In re D. J. B.* (1971) 18 Cal.App.3d 782 [96 Cal.Rptr. 146]. There too the minor objected to the finding of jurisdiction, which apparently rested entirely on an admission that on a single specified occasion she "left her father's home without his consent." (*Id.*, at p. 784, see p. 786.) The court observed, "This evidence, *without more*, is not of such a substantive nature as to be indicative of the loss of parental control which would justify official intervention." (*Id.*, at p. 786, italics added.) The court noted in particular the absence of evidence that the minor "intended to remain away from home for any length of time." (*Id.*, at p. 787.)

■ These cases support the proposition that, *by itself*, a single act in violation of parental authority is ordinarily insufficient to establish that the minor is beyond parental control, particularly where the minor denies that he or she is beyond control. Here, however, there were additional bases on which the court could reach the requisite finding. Bettye formally admitted the petition. By statute this might have been sufficient to waive the jurisdictional hearing altogether.[6] It also operated as an evidentiary admission of the allegations that she ran away from home, "refuse[d] to return," and had "irreconcilable differences with her father." The probation officer who had initial oversight of Bettye's case and who filed the section 601 petition testified, "Bettye made it quite clear . . . she would under no circumstances return home." Bettye's own probation officer testified that "at every opportunity that I have asked Bettye to get together with her father on some level, whether it be therapy or whatever, she has always said that that could never happen." When Bettye was asked whether she would stay in her father's home if placed there, she replied, "No."

---

[6]Section 657 provides in pertinent part, "[A] minor who is alleged to come within the provisions of Section 601 or 602 may, with the consent of counsel, admit in court the allegations of the petition and waive the jurisdictional hearing." (See also Cal. Rules of Court, rule 1488(c)-(e).)

The court found that Bettye was mature, intelligent, and independent for her years—was "in essence a grownup." The court also found that if she were returned to her father's residence, she "would run away at the first opportunity, I have no doubts of that."

In short, this is not a case where the finding rested entirely on a single act of disobedience. Bettye's refusal to submit to parental authority appeared to be both resolute and rational. The court could and did find that if returned to her father she would simply run away again. To hold the evidence here insufficient would be to require the futile and hazardous exercise of requiring a minor in Bettye's position to *prove* her expressed intentions through repeated acts of defiance. Rather, the question whether her expressed intentions were real was addressed to the juvenile court as factfinder. Would she actually submit to her father's authority if the petition were denied, or did she mean what she said—that she would run away? It was for the juvenile court to answer these questions in the first instance, and it did so. We see no reason to overturn its findings.

A similar analysis answers appellant's contention that the juvenile authorities here "colluded" with Bettye to deprive appellant of the reunification services and procedural protections he would enjoy if the petition had been filed under section 300, relating to dependency, rather than under section 601. The notion that the petition was not filed and admitted in good faith is a factual one, to be addressed by the juvenile court in the first instance. There is no evidence of collusion or that the petition was filed in bad faith. Nor was appellant's right to produce such evidence infringed.

Appellant's opportunity to refute his daughter's admission of the petition is one of several important distinctions between this case and *In re Brendan P.* (1986) 184 Cal.App.3d 910 [230 Cal.Rptr. 720], which appellant relies upon because it reversed a finding of dependency resting entirely on the mother's admission of the allegations of a section 300 petition. That finding was marked by numerous grave deficiencies, notably that the father had no real notice of, or opportunity to refute, the allegations of the petition. The effect of this procedure was to subvert a valid subsisting order of the family law department of the same court. (See *id.*, at pp. 916, 920.) No comparable facts are presented here.

Appellant contends that the "real" basis for the order here was his supposed unfitness as a parent; that Bettye was not "delinquent" and therefore not a suitable subject for a section 601 petition; and that therefore the matter should have proceeded under section 300 rather than 601. This argument has no sound basis in law or logic.

■ An adjudication under section 601 neither requires nor implies a finding of "delinquency." A distinction is drawn between conduct described in section 601, generally referred to as "status offenses," and that outlined in section 602, which may be described as "delinquency." (See *In re Michael G.* (1988) 44 Cal.3d 283, 293 [243 Cal.Rptr. 224, 747 P.2d 1152] [considering whether disobedience of court order could have effect of "elevating a section 601 ward to delinquency status"]; 2 Cal. Juvenile Court Practice (Cont. Ed.Bar 1981) § 23.2, p. 220 [history of statutory distinction between status offenders and delinquents].)

This important distinction appears to have been overlooked in the case cited by appellant, *In re Henry G.* (1972) 28 Cal.App.3d 276 [104 Cal.Rptr. 585]. The court there treated section 601 as depending on "failings" in the minor: "If . . . the breakdown in parental control is because of failings in the parent rather than in the minor, a section 601 petition could not be sustained . . . ." (*Id.*, at p. 284.) Moreover, the court appeared to view sections 300 and 601 as mutually exclusive, such that if the parent was "the one who has lost control, a dismissal of section 601 charges would follow." (*Ibid.*) We are aware of no justification for this gloss on the pertinent statutes. It rests in part on the idea that a declaration of wardship under section 601 stigmatizes the minor and therefore is justified only if the minor's conduct is blameworthy. (See 28 Cal.App.3d at pp. 283-284, fn. 6.)[7] However, the case cited for this view arose under section 602, not 601. (*In re Gladys R.* (1970) 1 Cal.3d 855, 865 [83 Cal.Rptr. 671, 464 P.2d 127], cited in *Henry G., supra,* 28 Cal.App.3d at p. 283, fn. 6.) As already pointed out, a clear distinction must be maintained between the implications of the two statutes.

Moreover there is no basis for the supposition that sections 300 and 601 are mutually exclusive. On the contrary, there is obvious overlap between them.[8] (Comment, *1961 California Juvenile Court Law: Effective Uniform Standards for Juvenile Court Procedure?* (1963) 51 Cal. L. Rev. 421, 424-425; 2 Cal. Juvenile Court Practice, *supra,* § 23.4, p. 221.) The Legislature

---

[7]Of course, the minor's desires are a factor to be considered in any such proceeding. The minor in *Henry G.* opposed an adjudication of wardship, asserting in effect that he was not beyond parental control but was reacting to unreasonable parental behavior. Here Bettye has competently decided, with the assistance of counsel, to accept the consequences of a section 601 adjudication.

[8]For that matter, there is overlap among all three statutes in the sense that a particular set of facts might support juvenile court jurisdiction under more than one of them. A minor who removed controlled substances from a parent's dresser and ingested them, all in defiance of parental authority, might be found to be a person described in sections 300, 601, and 602. There is no legal or factual basis for holding that in such a situation jurisdiction must be asserted exclusively on the basis of a particular statute. Rather, a petition under any one of the three statutes might be sustained if the evidence met the requirements of the provision relied upon.

has explicitly acknowledged their overlapping applicability by calling for written protocols to deal with minors who appear to "come within the description of both Section 300 and Section 601 or 602." (§ 241.1, subd. (a).)

The exclusivity posited in *Henry G.* lacks support not only in statutory language, but in fact. The loss of parental control is rarely if ever attributable solely to the parent or the child. It is instead the result of a long and complicated chain of actions and reactions culminating in the child's refusal to submit to parental authority. To attempt to affix responsibility on one party or the other is alien not only to the spirit and letter of the juvenile court laws, but to any realistic view of family relationships.

The only apparent basis for appellant's assertion that the "real" basis for the petition was his unfitness as a parent is the fact that the trial court admitted evidence concerning the conditions under which Bettye was living. The mere admission of that evidence does not establish judicial bias, collusion, or pretext. The evidence was relevant to support the claim that Bettye would not remain with her father if returned to his custody. It did not become inadmissible simply because it might have supported a claim that appellant was unfit. Nor did the failure to proceed under section 300 deprive appellant of the ability to rebut this evidence. He had every opportunity to offer any evidence he could produce to persuade the court that Bettye would submit to his control if returned to his physical custody. The fact that he failed to present any such evidence is not attributable to the department's decision to proceed under section 601.

We also note the contradiction inherent in appellant's contention that this case should have been brought on grounds of parental unfitness. Appellant, who has always vigorously denied that he *was* unfit, never showed any willingness to submit to the juvenile court's jurisdiction so as to receive services necessary to restore a working parent-child relationship. Instead he persistently denied that any problem existed, refused to cooperate with juvenile authorities, and resisted every effort to address the problems that led Bettye to run away from home. We fail to see how appellant was prejudiced by the absence of a finding that he was an unfit parent when he consistently disputed the propriety of such a finding.

What appellant really contends is that the petition should have been brought under section 300 so that he could refute it by proving that he was *not* unfit. In other words, the department should have been compelled to erect a straw man so that he could knock it down. The question is not and never was whether appellant provided an unfit home. The question was

whether Bettye was subject to his control. There is no basis for overturning the trial court's determination that she was not.

## IV.

### Dispositional Matters

Appellant claims it was error not to consider dispositional orders less drastic than out-of-home placement and not to make or direct more vigorous efforts toward reunifying him with Bettye. He makes no clear distinction between conduct and rulings at the time of the first assertion of juvenile court jurisdiction over Bettye, and the rulings actually under review here. Only the latter are properly before us, and as to them we find no error.

Where a minor is declared a dependent under section 300, out-of-home placement can be ordered only where specified conditions are met (§ 361, subd. (b)), and reunification services must be provided (§ 361.5, subd. (a)). By their terms these statutes are inapplicable to a proceeding under section 601. Likewise, cases cited by defendant, decided under other statutes, appear inapplicable. (*In re James T.* (1987) 190 Cal.App.3d 58 [235 Cal.Rptr. 127] [§ 300]; *In re Terry E.* (1986) 180 Cal.App.3d 932 [225 Cal.Rptr. 803] [Civ. Code, § 232].) Appellant implicitly contends, however, that these requirements should nonetheless apply because this matter "should" have proceeded under section 300 rather than section 601. We have already addressed that contention and found it wanting.

This proceeding is, however, subject to the broader statements of legislative purpose governing the juvenile court law as a whole: "The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public. When removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective." (§ 202, subd. (a).) The question is whether the proceedings in this case satisfied these objectives.

In a real sense, the juvenile court did not "remove" Bettye from appellant's custody but merely took her under the protection of the Juvenile Court Laws in view of her self-removal from his custody. Although Bettye professed filial love for appellant and the trial court hoped the two of them could establish a functioning relationship after some "breathing room," the child wanted nothing to do with her father for the time being. Bettye did not

even want appellant to know where she was because on previous occasions he had followed her around, sometimes just staring at her. She did not believe he would hurt her but did think that, having "kidnapped" her when she was small, he would try to take her away.

Despite Bettye's strenuous resistance to any contact with appellant, probation officers initially sought to encourage reunification. These efforts were thwarted at least in part by appellant's own refusal to cooperate. When she first submitted herself to authorities Bettye wanted to go into a foster home immediately. Ms. Yalon insisted instead on placing Bettye at Huckleberry 2, a family unification program, where Yalon hoped that appellant and Bettye, assisted by a therapist, could find common ground. Yalon testified without contradiction that appellant was "dead set" against this plan. The plan failed because appellant defied Yalon's requests that he leave Bettye alone for a time "so that I could get her to the point where they could meet with their therapist." Appellant discovered Bettye's whereabouts through court records and started parking his car across the street, in essence keeping Bettye under surveillance, which "scared" her. Even after this, Yalon continued to raise the issue of reunification with Bettye, who "adamantly" told her "that she does not want to be reunified with him."

In short, the evidence amply establishes that not only did Bettye resist having anything to do with appellant, but appellant refused to cooperate with the efforts of juvenile authorities to effectuate reunification or work out "less drastic" placement alternatives.

We thus cannot accept appellant's premise that the court ruled as it did "simply because Bettye stated that she did not wish any contact with her family." Instead the court expressly found that an award of custody to appellant would be detrimental to Bettye, that out-of-home placement was in her best interests, and that reasonable efforts had been made to prevent her removal from the home. These findings, and the ultimate determination that she was beyond her father's control, are supported by substantial evidence.

Accordingly, the orders appealed from are affirmed.

Smith, J., and Benson, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 18, 1991.