**HAN–LEE MAO v. BROWNELL,**
**Atty. Gen.**
**No. 11744.**

United States Court of Appeals District of Columbia Circuit.

Argued June 23, 1953.

Decided Sept. 4, 1953.

Mr. Jack Wasserman, Washington, D. C., for appellant.

Mr. Charles Gordon, Atty. Immigration & Naturalization Service, Department of Justice, of the Bar of the Supreme Court of New York, *pro hac vice*, by special leave of Court, with whom Messrs. Leo A. Rover, U. S. Atty., Washington, D. C., William J. Peck, Asst. U. S. Atty., and L. Paul Winings, General Counsel, Immigration & Naturalization Service, Department of Justice, Washington, D. C., were on the brief, for appellee.

Messrs. Charles M. Irelan, U. S. Atty. at the time record was filed, and William R. Glendon, Asst. U. S. Atty. at the time record was filed, Washington, D. C., entered appearances for appellee.

Before EDGERTON, WILBUR K. MILLER and PROCTOR, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

The question here is whether, under the Passport Act of 1918, as amended,[1] and as implemented by executive proclamation and regulations, the Attorney General may order an alien not to depart from the United States because of his finding, made without affording a hearing, that the alien's departure would be prejudicial to the interests of this country. The pertinent portion of the amended Act is the following:

"When the United States is at war or during the existence of the national emergency proclaimed by the President on May 27, 1941, or as to aliens whenever there exists a state of war between, or among, two or more states, and the President shall find that the interests of the United States require that restrictions and

---

1. 40 Stat. 559, 55 Stat. 252, 22 U.S.C.A. § 223.

prohibitions in addition to those provided otherwise than by this Act be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful—

"(a) For any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe * * *."

It is not disputed that subsequent legislation [2] kept alive the emergency power which the statute gave the President, and that a proclaimed state of national emergency existed when Mao was forbidden to depart, has existed continuously since, and still exists.

Proclamation No. 2523, U.S.Code Congressional Service 1941, p. 883 [6 Fed. Reg. 5821, 5822], issued November 14, 1941, after reciting conditions showing the need for action under the statute, directed that

"No alien shall be permitted to depart from the United States if it appears to the satisfaction of the Secretary of State that such departure would be prejudicial to the interests of the United States as provided in the rules and regulations hereinbefore authorized to be prescribed by the Secretary of State, with the concurrence of the Attorney General."

Regulations promulgated under the Passport Act included, at the time the order was entered, the following [8 Code Fed. Regs. § 175.25 (1949)]:

"The departure of an alien who is within one or more of the following categories shall be deemed to be prejudicial to the interests of the United States, for the purposes of these regulations:

* * * * * *

"(c) Any alien departing from the United States for the purpose of engaging in, or who is likely to engage in, activities designed or likely to obstruct, impede, retard, delay, or counteract the effectiveness of the national defense of the United States or the measures adopted by the United States in the public interest or for the defense of any other country."

With the sources of the Attorney General's authority thus before us, we turn to the facts involved here. Han-Lee Mao, a native of China, came to the United States in 1947 for scientific study. In 1951, having earned a master's degree in oceanography, he desired to return to his native country whose armies, under Communist control, were fighting our military forces in Korea. The steamship company to which he applied for passage referred him to the Immigration and Naturalization Service at Los Angeles. He went there October 14, 1951, and was interrogated under oath as to his immigration status by an Immigration inspector. This questioning disclosed the fact that he came here under the auspices of the Nationalist Government of China, with a passport issued by it. He is not an enemy alien, since we have not been technically at war with Communist China.

Four days later Mao was notified by the District Director of the Service that his departure from the United States had been temporarily prevented under the statute, proclamation and regulation which we have quoted above. An affidavit made by the Commissioner of Immigration and Naturalization says:

" * * * The basis for this order was a finding that if he were permitted to go to Communist China,

---

**2.** Emergency Powers Interim Continuation Act, as amended, 66 Stat. 54, 96, 137, 296 and Emergency Powers Continuation Act, 66 Stat. 330: Immigration and Nationality Act of 1952, 66 Stat. 190, 8 U.S.C.A. § 1185.

whose armies were and are engaged in armed combat with the military forces of the United States in Korea, plaintiff's scientific training and knowledge might be utilized by Communist China and other potential enemies of the United States in seeking to undermine and defeat the military and defensive operations of this Nation, and that his departure at the present time consequently would be prejudicial to the best interests of the United States."

After exit permission had been denied, the appellant attempted to get the ruling rescinded. He filed with the Immigration officials many letters of endorsement from friends and associates and employed counsel to write a letter in his behalf. When all efforts to obtain reconsideration failed, Mao sued in the United States District Court for the District of Columbia for a declaration of rights and for injunctive relief from the order which denied him permission to depart,

> " * * * on the ground that the Passport Act of 1918 as amended, as construed and applied by the defendant to the plaintiff, is unconstitutional and contrary to the Due Process Clause of the Fifth Amendment."

His complaint contained the following paragraph:

> "17. That the aforesaid Passport Act of May 22, 1918 as amended, as applied to the plaintiff is unconstitutional and violates the due process clause of the Constitution insofar as it authorizes the defendant to detain the plaintiff in the United States upon standards which are void because of vagueness, and insofar as it authorizes the entry of such an order denying exit permission to the plaintiff without a hearing, and insofar as it delegates legislative pow-

ers to executive officers of the Government."

A three-judge District Court, assembled pursuant to 28 U.S.C. §§ 2282 and 2284, saw no substantial question as to the constitutionality of the statute and returned the case to a single judge, who later dismissed the complaint as failing to state a claim upon which relief could be granted.

On this appeal from the order of dismissal, the appellant contends he is entitled to injunctive relief on the ground that the statute itself is unconstitutional in that it denies a due process hearing, provides no standards to govern executive judgment, and improperly delegates legislative power. But, since the three-judge District Court denied Mao an injunction on his plea of the statute's unconstitutionality, and since 28 U.S.C. § 1291 withholds from us jurisdiction to review the judgment of such a court, we do not stop to consider the grounds on which it is asserted the Act itself is unconstitutional. Mao could have taken a direct appeal to the Supreme Court under 28 U.S.C. § 1253 but, as he did not do so, the decision of the three judges is final and conclusive. It is therefore settled for the purposes of this proceeding that the Attorney General acted under a constitutional statute.

But the order of dismissal entered by the single district judge to whom the case was returned amounted to a holding that the Attorney General acted within the legislative grant of authority and that he violated no constitutional right of the appellant in acting as he did. Mao is entitled, as the government concedes, to judicial review of that holding.[3]

Courts ordinarily regard it as beyond their province to interfere with the exercise of what has been aptly called the "peculiarly political" sovereign power of the United States to deal with

---

3. The Attorney General admits in his brief that the appellant can "solicit judicial intervention" in order "to test the constitutionality of the statute or to ascertain whether the Attorney General's action complies with authority granted by the statute and the Constitution."

aliens. For example, in Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 588, 72 S.Ct. 512, 519, 96 L.Ed. 586, the Supreme Court said:

" \* \* \* [A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."

But, as the Court was careful to imply, governmental policy toward aliens is not wholly immune from judicial power. The political branches of government cannot deny the protection of the Fifth Amendment to an alien who is entitled to invoke it.[4]

■ The case turns on the question whether a due process hearing is a condition precedent to an order forbidding Mao, who is not an enemy, to leave the country. The fact that the Passport Act does not in terms require the Attorney General to grant a hearing before denying exit permission does not necessarily mean that the alien is not entitled to be heard, for if the Constitution requires a

hearing, the statute must be read as commanding that it be afforded. Yamataya v. Fisher, (The Japanese Immigrant Case,) 1903, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721; Wong Yang Sung v. McGrath, 1950, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616. In the latter case, the Court said, 339 U.S. at page 49, 70 S.Ct. at page 454:

" \* \* \* The constitutional requirement of procedural due process of law derives from the same source as Congress' power to legislate and, where applicable, permeates every valid enactment of that body."

■■ It has been held that "Whatever the procedure authorized by Congress, it is due process as far as an alien denied entry is concerned." [5] But that is not the rule with respect to a resident alien who is lawfully present in the United States. He is protected by the Fifth Amendment from being deported or detained without due process of law. Of many cases to that effect, perhaps the most frequently cited is The Japanese Immigrant Case, from which we have quoted in note 4 above. There the Supreme Court said that an alien who has entered the country and become subject to its jurisdiction is "part of the population" and cannot be deported by any

---

4. In Yamataya v. Fisher, (The Japanese Immigrant Case) 1903, 189 U.S. 86, at pages 100–101, 23 S.Ct. 611 at page 614, 47 L.Ed. 721, it was said:

"\* \* \* But this court has never held, nor must we now be understood as holding, that adminstrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution. One of these principles is that no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends—not necessarily an opportunity upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be ap-

propriate to the nature of the case upon which such officers are required to act. Therefore, it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States. No such arbitrary power can exist where the principles involved in due process of law are recognized."

5. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317; Nishimura Ekiu v. United States, 1892, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146.

executive officer unless he is given an opportunity to be heard upon the questions involving his right to be and remain in the United States. We think it equally true that an executive officer cannot detain in this country an alien lawfully resident here without first giving him a chance to be heard on the questions involving his right to leave the United States.

Kwong Hai Chew, the alien involved in the recent case of Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 73 S.Ct. 472, had bought a home, applied for naturalization, and perhaps given other indications of an intention to maintain permanent residence in the United States. In his case the Supreme Court said, 344 U.S. at page 596, 73 S.Ct. at page 477:

> "1. It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there, he is a person within the protection of the Fifth Amendment. He may not be deprived of his life, liberty or property without due process of law."

■ We do not think the Court intended, by using the word "permanent" in this statement from Chew's case, to hold or imply that a resident alien, in order to be entitled to Fifth Amendment protection, must intend to spend his life here. The statement was carefully worded to fit the case in hand and was not intended, we think, to limit constitutional protection to an alien whose residence is permanent in the strictest sense of the word. This is borne out by the fact that the Chew opinion quotes with apparent approval from a concurring opinion in an earlier case which says the Fifth Amendment extends to an alien who "enters and resides in this country," without reference to the length or permanence of residence.[6] That statement is in accord with the holding of numerous previous cases.

We rely upon the Chew case as additional authority for holding the appellant entitled to invoke the Fifth Amendment. As he lawfully entered in 1947 and has lawfully remained in the United States, he is "part of its population," to the extent at least of having the right to a due process hearing before an executive officer can detain him here against his will. He was not afforded such a hearing.

The order of dismissal entered by the District Court will be set aside. Upon remand, that Court should enter in its stead a judgment holding the Attorney General's order null and void, and should enjoin him from denying exit permission to the appellant without first giving him a full and fair hearing.

Reversed and remanded.

6. Bridges v. Wixon, 1945, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103, where it was said in the course of the concurring opinion:

"* * * [O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments * * *. None of these provisions acknowledges any distinction between citizens and resident aliens."