(Nos. 56552, 56572.—

*In re* WALTER POLOVCHAK, Appellee and Appellant (The People of the State of Illinois, Appellant and Appellee).

*Opinion filed May 27, 1983.—Rehearing*
*denied September 30, 1983.*

214

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joan S. Cherry, and Kevin Sweeney, Assistant State's Attorneys, of Chicago, of counsel), for the People.

Julian E. Kulas, of Chicago, and Henry Mark Holzer, of Brooklyn, New York, for appellee and appellant Walter Polovchak.

Roger Baldwin Foundation of ACLU, Inc., of Chicago

(Diane Geraghty, Harvey Grossman, Steven Lubet, and Richard L. Mandel, of counsel), for appellees Michael and Anna Polovchak.

Dan K. Webb, United States Attorney, of Chicago (Nancy K. Needles and Frederick H. Branding, Assistant United States Attorneys, of counsel), for the United States of America.

JUSTICE UNDERWOOD delivered the opinion of the court:

On July 19, 1980, pursuant to a petition for adjudication of wardship, the circuit court of Cook County appointed a guardian *ad litem* for 12-year-old Walter Polovchak, and, over the objection of Walter's parents, Michael and Anna Polovchak (the Polovchaks) placed the boy in the temporary custody of the Illinois Department of Children and Family Services (DCFS). Walter was subsequently found to be a minor in need of supervision and adjudged a ward of the court under the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, pars. 702—3(a), 704—8). Temporary custody remained in DCFS with supervised visits arranged between Walter and his parents. Prior to the dispositional hearing, Michael and Anna Polovchak filed an interlocutory appeal pursuant to Rule 662 (73 Ill. 2d R. 662). A divided appellate court reversed (104 Ill. App. 3d 203), and we allowed the petitions of both the State and Walter for leave to appeal.

Michael and Anna Polovchak, and their three children, Natalie, age 17, Walter, and Michael, age 5, arrived in the United States from their homeland, the Ukrainian Soviet Socialist Republic, in January 1980. The family spent the first few weeks in Chicago with Mr. Polovchak's sister and her husband before moving to an apartment on the northwest side of Chicago with Mr. Polovchak's 24-year-old nephew, Walter Polovchak (cousin Walter). Although both parents apparently began working in Chicago, they de-

cided, after a few months, to return to the Ukraine. Natalie decided that she did not want to return with her parents, and Walter, although initially undecided, determined that he, too, wanted to remain in this country. Mr. Polovchak did not challenge his daughter's decision; however, he was adamantly opposed to allowing Walter to remain in this country. Apparently there was considerable tension between cousin Walter and the Polovchaks, who believed that the cousin was encouraging their son to remain in this country.

Cousin Walter secured another apartment and began moving, apparently on July 12. He and Natalie had had a conversation prior to the move, and it was decided that Natalie would move with her cousin. Walter also told his cousin that he would be joining in the move. The parents were apparently aware of some of these arrangements because on Saturday night, July 12, there was a heated family argument during which Mr. Polovchak, who was quite upset, demanded to know why Natalie was taking his son away.

The next morning, pursuant to a prearrangement, cousin Walter met Natalie and Walter a block or two from the parents' apartment and the three went to church. After lunch, they returned to a point near the parents' apartment, and, while the two Walters waited there, Natalie went alone to the apartment to get some of her belongings. She and her father argued about Walter, and the father followed her to the bus stop. Walter and his cousin apparently saw the father approaching and left. Later that day, Natalie joined her brother and cousin at the latter's apartment, where the three spent the night.

The following day, July 14, Natalie, her brother and cousin, and two adult friends of cousin Walter's went to the parents' apartment with two vehicles. The parents were at work, but as Natalie and Walter began gathering their belongings, their mother arrived. She attempted to

learn where they were taking her son but was rebuffed. Her son, speaking to her in Ukrainian, said something to the effect that she should not be concerned. Natalie and Walter spent the next four days at their cousin's apartment, and while no one informed the parents of their whereabouts, it is clear from the record that the Polovchaks knew that their children were together and with cousin Walter but did not know where his apartment was located. Cousin Walter contacted his attorney (who later became counsel for Natalie and Walter) on July 14 or 15.

On July 18, Mr. Polovchak went to a Chicago police station with an interpreter to attempt to find his son. According to a report filed by Sergeant Leo Rojek, Mr. Polovchak stated that Natalie had enticed Walter to run away from home rather than return to the Ukraine, and she was hiding him in cousin Walter's apartment. After apparently receiving a telephone number for cousin Walter's place of employment, the police ascertained his home address; they subsequently went to the apartment, located Walter, and took him back to the station.

After arriving at the station, Walter was asked why he ran away from home. He responded that his father intended to return to the Ukraine, but that he wanted to stay in this country. The police then contacted the United States Immigration and Naturalization Service and the Department of State and were instructed by officials from the Department of State that Walter was not to be returned to his parents. The police also contacted a Cook County judge who recommended that Walter be detained overnight as a runaway and brought to juvenile court the following morning. At some point during the processing, Natalie and cousin Walter's attorney, whom the cousin had apparently retained to represent Walter and Natalie, arrived at the police station. Walter was processed as a minor in need of supervision and placed with his sister and their attorney at the latter's residence. Mr. Polovchak was told of the court

date the following morning and advised that he and his wife would be transported to the hearing by the police.

A petition for adjudication of wardship was subsequently filed by a police officer, alleging that Walter Polovchak, age 12, was "beyond the control of his parents in that he did on/or about July 14, 1980 at 9:00 A.M. at Cook County, Illinois, absent himself from his home without the expressed consent of his parents, in violation of Chapter 37, Section 702—3a, Illinois Revised Statutes, 1979," and that it was in the best interests of the minor and the public that Walter be adjudged a ward of the court.

On July 19, Walter appeared in court with the retained attorney. Also present were an assistant State's Attorney, counsel for the subsequently appointed guardian *ad litem*, a representative of DCFS, a representative of the Immigration and Naturalization Service of the United States, several police officers, and the Polovchaks. The trial judge asked whether Walter was prepared to plead to the charge, and, after an off-the-record conference between the assistant State's Attorney and counsel for the guardian *ad litem*, the latter entered a denial on behalf of Walter. She also informed the court that she and the assistant State's Attorney had agreed to the appointment of a temporary custodian. The assistant State's Attorney advised the court that it was her understanding that the parents were not in agreement with the temporary custody arrangement.

The Polovchaks neither spoke nor understood English, they did not have an attorney, nor were they provided with counsel or a court-appointed interpreter. Walter's private attorney, who speaks Ukrainian, advised the court that there were Ukrainian-speaking people in the courtroom, and a woman, whose status is not disclosed by the record, volunteered to interpret for the parents. Through the interpreter, the trial judge ascertained that Walter had been away from home since July 14, and that the parents wanted to take him home with them. The court informed

the Polovchaks that Walter would be placed in the temporary custody of DCFS pending a social investigation by a probation officer and a full hearing to determine whether Walter was a minor in need of supervision and whether he would be removed or returned to the custody of his parents. The parents were also advised that they had the right to be represented by counsel and that they should return to court with their attorney on July 30. No evidence was taken at this hearing; despite the parents' opposition, an order said to be "by agreement" was entered appointing the Guardianship Administrator of DCFS temporary custodian. In addition, the following findings of fact were entered on a preprinted form: that probable cause existed to believe that Walter was a minor otherwise in need of supervision, and that Walter should be placed in custody, in a suitable place, pending a further hearing because it was a matter of immediate and urgent necessity for his protection, he had been away from home for five days, he had in open court stated that he would not remain with his parents if released, and on his own motion he requested the court to order protective detention.

A petition was subsequently filed seeking to have Natalie Polovchak adjudged a ward of the court. The allegations of this petition were virtually identical to those contained in the previous petition on behalf of her brother. The hearing that followed on both petitions extended over a two-day period. All parties were represented by counsel, and several interpreters were present.

At the outset of the July 30 adjudicatory hearing, the trial court denied a motion by counsel for the Polovchaks to vacate the temporary custody order of July 19 on the grounds that it was not in compliance with the Juvenile Court Act. Over the objection of opposing counsel, the attorneys for Natalie and Walter then entered admissions on behalf of their clients "to the charges that they [were] minors in need of supervision." All four members of the

Polovchak family, including Walter, subsequently testified through an interpreter. The court also heard testimony from cousin Walter, Sergeant Rojek, and two psychiatrists. The evidence indicated that Walter left his parents' home without their consent and stayed with his sister and cousin for the next few days in the cousin's apartment and that he was motivated in doing so by his desire to stay in this country rather than return to the Ukraine. While both Natalie and cousin Walter denied that either influenced Walter's decision, it is clear that Walter's cousin had told Walter that he would help him if Walter decided not to go back to the Ukraine with his parents; it is also undisputed that Natalie, cousin Walter and his two adult friends assisted him in removing his belongings from his parents' home. Walter testified that had his sister and cousin not assisted him or allowed him to stay with them, he would have still left his parents' apartment and gone somewhere else.

Both the State and the Polovchaks presented psychiatric testimony. The two psychiatrists, Dr. Ner Littner and Dr. Robert Bussell, neither of whom examined Walter, testified in response to hypothetical questions which essentially incorporated the salient facts of this case. Neither expert believed that Walter was beyond the control of his parents. In addition, Dr. Littner, the Polovchaks' witness, stated his opinion that Walter's behavior was an immature act of defiance and rebellion rather than an independent judgment, and that the assistance of Walter's sister and cousin provided his actions with an aura of respectability or gave Walter a rationalization for rebelling against his parents. Further he stated that Walter was not a runaway nor did he engage in the type of behavior common to a runaway, who would ordinarily be certain not to let his parents know where he was going. Dr. Littner believed that, had Walter not been assisted by his cousin and sister, he may have manifested his disagreement with his parents by locking himself into a room and refusing to come out. The

psychiatrists disagreed on whether a 12-year-old boy had the ability to make an independent judgment as to which country he preferred to live in; their opinions also differed on the extent of emotional harm that would result to Walter from a continued separation from his parents.

At the conclusion of the hearing on August 4, 1980, the trial court found both Natalie and Walter to be minors in need of supervision and also adjudicated them wards of the court. Thereafter, during a discussion of possible temporary dispositions, including Walter's return to his parents, the judge was told by the DCFS worker that Walter had threatened suicide if returned "home." The worker indicated she would have so testified under oath, but the trial court denied a request that she be sworn. While the State attempts to rely on the alleged suicidal threats, we believe the references thereto are too nebulous for that purpose. There had been no reference to such threats in the initial appearance before the court or during the adjudicatory hearing. The later reference was neither under oath nor subject to cross-examination, and Walter neither testified, nor was he asked, about the matter. It is not entirely clear whether "home" was understood by Walter as the apartment of his parents or the Ukraine. Finally, the court had already announced its decision before the worker, who apparently neither spoke nor understood Ukrainian, volunteered the information.

On November 5, the date scheduled for the dispositional hearing, the Polovchaks filed notices of appeal from the wardship adjudications and the temporary custody orders. Natalie is no longer a minor under our juvenile act, and she is not involved in this appeal.

The United States Attorney for the Northern District of Illinois, at the direction of the Attorney General of the United States, has filed a "suggestion of interest" in this court advising us that, on July 19, 1980, the district director of the Immigration and Naturalization Service, with the

advice of the Department of State, granted Walter Polovchak's petition for asylum. Walter's status was subsequently changed to permanent resident alien. We are informed that the Immigration and Naturalization Service has also entered a departure control order which prohibits the departure of Walter from the United States. While advising us that the United States has no direct interest in the legal issues presented concerning our State statute, the United States Attorney suggests that any decision regarding the final custody of Walter respect the supremacy of the obligations of the United States under the Refugee Act of 1980 (94 Stat. 109, 8 U.S.C. 1182 (1980)) and the international obligations of the United States under the United Nations Protocol Relating to the Status of Refugees. 19 U.S.T. 6224-29 (1968).

Both the State and Walter argue that the parents should have been estopped from taking an interlocutory appeal under our Rule 662. The appellate court denied the State's motion to dismiss the appeal on that ground, a decision with which we agree. It is unnecessary to lengthen this opinion by quoting or discussing the portions of the record which demonstrate that the charges that the appeal was "fraudulently" based, that the parents "deceived" the trial court or adopted dilatory tactics for the purpose of taking an appeal are unfounded. Suffice it to say that the delay between the date of the wardship adjudication and the date scheduled for the dispositional hearing resulted from a number of factors, some of which were directly attributable to the State and the minors. Too, we do not doubt that the multiple litigation and controversy surrounding this case have also adversely affected what should otherwise have been a prompt determination regarding Walter's custody. In fact, on the date scheduled for the dispositional hearing, he had been removed from the custody of his parents for 3½ months. Under the circumstances of this case, where the parents, but not the minor,

were contesting the adjudication of wardship and the determination that their son was a minor in need of supervision, and an order of disposition had not been entered within 90 days of the adjudication of wardship, we hold that the parents properly invoked our Rule 662 to appeal (73 Ill. 2d R. 662).

The stated purpose of our Juvenile Court Act "is to secure for each minor subject hereto such care and guidance, *preferably in his own home,* as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community; *to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal \*\*\*.*" (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 37, par. 701–2(1); *People ex rel. Davis v. Vazquez* (1982), 92 Ill. 2d 132, 142-43.) Just as the Act severely limits the authority to hold a minor in custody (*People v. Woodruff* (1981), 88 Ill. 2d 10, 14), it quite clearly directs the court before whom the minor is brought to release the minor to the custody of his parents rather than prescribe detention or shelter care unless it is found that it "is a matter of immediate and urgent necessity for the protection of the minor or of the person or property of another, that he is likely to flee the jurisdiction of the court or that the minor was taken into custody under a warrant." Ill. Rev. Stat. 1979, ch. 37, pars. 703–4, 703–6.

While the original order removing Walter from the custody of his parents includes a finding that the order was a matter of immediate and urgent necessity for Walter's protection, evidence in the record simply does not support that finding. None of the witnesses present, the minor, the parents or anyone else able to give relevant testimony was examined. (Ill. Rev. Stat. 1979, ch. 37, par. 703–6.) Nor did Walter state, as the findings would seem to indicate, that he would not remain with his parents if released. In-

deed, it is clear from the later proceedings that Walter's obstinance stemmed not from his opposition to being reunited with his parents but rather from his desire not to return to the Ukraine, an unlikely possibility, had the court released him to his parents, in view of the interest manifested by the Federal agencies. The factual allegation in the petition was that Walter had been away from home for five days without the expressed consent of his parents. Whether the court was aware, at the initial hearing, of the circumstances under which Walter left his parents' home or that he had been staying with his cousin and older sister, rather than at large in the city of Chicago, is also unclear since no one specifically advised the court, at least on the record, of these facts. It is, in our opinion, clear that, given the absence of evidence to support the finding required by statute, Walter should have been released to the custody of his parents, who were in the courtroom requesting permission to take their son home.

The statutory provision under which Walter was later adjudicated a minor in need of supervision then provided: "Those otherwise in need of supervision include (a) any minor under 18 years of age who is beyond the control of his parents, guardian or other custodian." (Ill. Rev. Stat. 1979, ch. 37, par. 702—3(a); the statute has since been amended by Public Act 82—969 (Minor Requiring Authoritative Intervention), approved Sept. 8, 1982, eff. Jan. 1, 1983.) The Act requires that an adjudicatory hearing be held to determine whether the allegations of the petition are supported by a preponderance of the evidence. (Ill. Rev. Stat. 1979, ch. 37, par. 701—4.) The decision of the trial court at that hearing should not be disturbed on appeal unless it is against the manifest weight of the evidence. See *In re Brown* (1981), 86 Ill. 2d 147, 152; *In re Stilley* (1977), 66 Ill. 2d 515, 520.

While this court has not previously construed the phrase "beyond the control" of one's parents, and the leg-

islature has not further defined or explained that term in the Act, we agree with the appellate court that it seems manifest that the legislature could not have intended that phrase to include an isolated act by a 12-year-old minor which poses no hazard to him or anyone else. Decisions in this court, while involving different issues, demonstrate that the initial determination that the minor was in need of supervision was predicated on the fact that he was incorrigible, a frequent runaway or his acts posed serious hazards to himself or others. See *In re R.R.* (1982), 92 Ill. 2d 423 (minor tried to poison her mother and was beyond her parents' control); *In re Baker* (1978), 71 Ill. 2d 480 (minor repeatedly ran away from home); *In re Sekeres* (1971), 48 Ill. 2d 431, *appeal dismissed* (1972), 404 U.S. 1008, 30 L. Ed. 2d 656, 92 S. Ct. 691 (minor frequently absented herself from home); *In re Presley* (1970), 47 Ill. 2d 50 (allegations in original petition seeking to adjudicate minor otherwise in need of supervision or neglected were that she had absented herself from home for long periods of time without parental consent and on a specific date was forced by her mother and stepfather to leave home); *cf. In re G.B.* (1981), 88 Ill. 2d 36, *cert. denied* (1982), 456 U.S. 963, 72 L. Ed. 2d 487, 102 S. Ct. 2041 (habitually truant minor); Ill. Rev. Stat. 1979, ch. 37, par. 702—3(b); Pub. Act 82—969 (minor requiring authoritative intervention), eff. Jan. 1, 1983; see also *In re Snyder* (1975), 85 Wash. 2d 182, 532 P.2d 278 (evidence that minor was adamant about refusing to return home, had established a pattern of refusing to obey her parents, and, on two occasions, in effect, fled her home, was sufficient to support the finding of loss of parental power and control); *In re D.J.B.* (1971), 18 Cal. App. 3d 782, 96 Cal. Rptr. 146 (a finding that a minor is beyond the control of his parents may be predicated on a single act if sufficiently serious; evidence that minor left home without parental consent was not of such a nature as to be indicative of the loss of parental control); *In re*

*Galvan* (La. App. 1980), 384 So. 2d 1000 (evidence that on two occasions minor left the home of his mother—the custodial parent—without consent and stayed with his father because his mother was planning to move the family to Texas or because he may have thought he would be sent to military school was insufficient to establish that the minor was habitually disobedient and was ungovernable by his mother or that he was a runaway child in need of supervision); *cf. In re Price* (N.Y. Fam. Ct. 1978), 94 Misc. 2d 345, 404 N.Y.S.2d 821.

Although the parties characterize the evidence differently and disagree as to its legal sufficiency, as the appellate court noted, no material facts were in dispute. With the help of his sister and cousin, Walter, a 12-year-old boy, left his parents' home without their consent and spent the next few days with his older sister at his cousin's apartment. This occurred during a time of considerable family tension regarding the Polovchaks' decision to return to their homeland. Neither psychiatrist, testifying in response to hypothetical questions based on these and other relevant facts, believed that Walter was beyond the control of his parents. We believe the appellate court correctly concluded that the trial court's decision was against the manifest weight of the evidence. Walter's actions, which can hardly be characterized as those of a runaway, and posed no hazard to him or anyone else, simply do not establish that he was beyond parental control.

The State argues, alternatively, that this court should remand for another hearing because Walter was not given the opportunity to present evidence that he was in need of supervision. Because the court indicated that it was going to conduct a hearing to determine whether there was a factual basis for the earlier admission entered by Walter, the State argues that Walter was limited in presenting evidence. Too, the State complains that, believing that there need only have been evidence to establish a factual basis

for the admission, it may have been misled concerning the amount of evidence it was required to produce, and should therefore have another opportunity. We cannot agree. The record shows that neither the State nor Walter was prevented from presenting any evidence relevant to the determination of whether Walter was beyond his parents' control. A full adjudicatory hearing was held; Michael, Anna, Natalie and Walter Polovchak, cousin Walter and several other witnesses testified; each witness was fully examined by all parties; and, as the appellate court stated, the record establishes that the State recognized its burden and proceeded accordingly.

We have been advised that Michael and Anna Polovchak have returned to the Ukraine. It is apparent, therefore, that Walter cannot immediately be returned to his parents, even assuming the Federal orders prohibiting his departure from this country had not been entered. We, of course, have considered only the issues before us, and our holding that the evidence before the circuit court did not support its action is dispositive only of those proceedings. Considering that, so far as we are presently informed, Federal litigation regarding the asylum and departure orders is still pending in the United States courts, we believe the appropriate disposition of this case is to remand it to the circuit court of Cook County with directions that it retain jurisdiction of Walter and this cause pending the return of Walter's parents, or either of them, to this country, in which event Walter's custody shall be given to the returning parents or parent. In the event that neither Michael nor Anna Polovchak shall return, the circuit court shall proceed in the manner it deems best suited to Walter's needs.

In view of our disposition here, we need reach neither the constitutional challenges nor the issue of whether the adjudication of wardship was in the best interests of Walter or the public.

For the reasons stated the appellate court's judgment

reversing the circuit court is affirmed, and the cause is remanded to the circuit court of Cook County with directions to proceed in accordance herewith.

*Affirmed and remanded,*
*with directions.*