**Anna POLOVCHAK and Michael Polovchak, Plaintiffs-Appellees,**

v.

**Edwin MEESE, III, United States Attorney General, and Michael Landon, District Director of the Immigration and Naturalization Service, Defendants-Appellants,**

**Walter Polovchak, Intervening-Appellant.**

**Nos. 85–2297, 85–2305.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1985.

Decided Sept. 10, 1985.*

Opinion Oct. 9, 1985.

---

* Because of the necessity for expedition (as this matter presumably becomes moot on Walter's eighteenth birthday, October 3, 1985), this case was decided by unpublished order on September 10, 1985. This opinion restates and elaborates upon the contents of that order.

Harvey Grossman, Roger Baldwin Foundation of ACLU, Inc., Chicago, Ill., for plaintiffs-appellees.

Carolyn Kuhl, Deputy Atty. Gen., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., for defendants-appellants.

Julian E. Kulas, Chicago, Ill., for intervenor-appellant.

Before CUDAHY and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

The government has appealed from the district court's entry of summary judgment and a permanent injunction against enforcement of a "departure control order," which bars the departure of Walter Polovchak from the United States. We sustain the summary judgment on the issue whether Walter's parents were deprived of their rights of due process when the departure control order was entered without their being afforded sufficient opportunity to participate. We vacate the injunction, however, and remand the case to the district court to fashion a remedy that takes into account Walter's interests as well as those of his parents.[1]

I

Michael and Anna Polovchak, citizens of the U.S.S.R., left that country with their three children and came to the United States in January 1980. They settled in Chicago, but after several months, they decided to return to the Soviet Union. Their two older children, Nataly, then seventeen years old, and Walter, then twelve, decided that they wished to stay in the United States. Michael and Anna Polovchak did not agree with Walter's decision,[2] and on July 13, 1980, Walter and Nataly left their parents' home and went to live with a cousin, who also lived in Chicago. On July 18 Michael Polovchak sought the assistance of the Chicago police to bring Walter home. The police took Walter from his cousin's apartment and brought him to the police station, where Walter informed them that he had left home because he did not wish to return to the Soviet Union. Upon the advice of the Immigration and Naturalization Service (INS) and the State Department, the police did not take Walter home but

---

1. At first, this case appeared to be moot because there was some indication in appellee's brief that Walter's parents were forswearing all efforts save persuasion to get Walter to return to the Soviet Union. Brief for Appellees, at 48–49. At oral argument, however, the waters were muddied as appellees suggested a wider range of possible strategies to which the elder Polovc-

haks might resort were the departure control order lifted. Thus, we have determined that the case is not moot and proceed to the merits.

2. Apparently, the elder Polovchaks did not dispute Nataly's choice, although she was not yet eighteen at that time.

instead instituted custody proceedings in the Circuit Court of Cook County. On July 19 the trial judge temporarily placed Walter in the State's custody, as a minor in need of supervision, pursuant to Ill.Ann. Stat. ch. 37, § 702–3. Walter's parents had notice of and attended this hearing.

Later that same day Walter, with his attorney but without his parents, filed an application for asylum with the regional INS office. His application stated that his religion was Baptist and that he did not want to return to the Soviet Union because he would be "persecuted ... prevented from higher education, considered suspect [and] restricted in mobility." The application further stated that the government of the Soviet Union had knowledge of his asylum application through the media. Walter's application for asylum was granted pursuant to 8 U.S.C. § 1158(a). In October 1981 Walter's status was changed to that of permanent resident alien, which is the status he enjoys today.

On July 30 the state trial court held a hearing on Walter's wardship, at which the elder Polovchaks were present and represented by counsel. On August 4 the court adjudicated both Walter and Nataly as wards of the court, thereby removing them from the custody of their parents.[3] In December 1981 the Illinois Appellate Court reversed the decision of the trial court, determining that the Polovchaks should not have been deprived of parental custody and releasing Walter to his parents. *In re Polovchak (Illinois v. Polovchak)*, 104 Ill. App.3d 203, 59 Ill.Dec. 929, 432 N.E.2d 873 (1981). Michael and Anna Polovchak had, however, returned to the Soviet Union in the interim, where they reside today. The Illinois Supreme Court affirmed the appellate court's decision in May 1983. *In re Polovchak*, 97 Ill.2d 212, 73 Ill.Dec. 398,

454 N.E.2d 258 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1413, 79 L.Ed.2d 740 (1984).

While the matter was before the Appellate Court, the Department of Justice served on all parties an *amicus curiae* brief which asked the court not to issue an order which would conflict with Walter's asylum. The brief also asserted that, if necessary, a "departure control order" would issue to prevent Walter from leaving the United States. When the Appellate Court restored the Polovchaks' custody rights, such an order was entered, on January 8, 1982, pursuant to 8 U.S.C. § 1185.[4] That section empowers the President to limit the departure from the United States of certain persons, including aliens. Under the regulations promulgated to effectuate the statutory provision, one circumstance in which a departure control order may issue is "when doubt exists whether such alien is departing or seeking to depart the United States voluntarily." 8 C.F.R. § 215.3(j).

In October 1980, shortly after Walter was granted asylum, the Polovchaks filed this action in federal district court.[5] The Polovchaks asserted that the grant of asylum to Walter violated their rights of procedural due process because they were not notified of Walter's application for asylum nor afforded an opportunity to be heard. They also alleged that the grant of asylum violated substantive constitutional rights protecting their privacy and the integrity of their family, as well as their right to raise and control their son and to participate in his major life decisions. They asked for damages and an order vacating the asylum. In September 1983 the Polovchaks amended the complaint to allege that the same substantive and procedural con-

---

**3.** Nataly turned eighteen soon thereafter and, an adult under both Illinois and Soviet law, was no longer the subject of any legal proceedings.

**4.** The order that was entered was, and continues to be, temporary. Under the applicable regulations, an alien who is the subject of a departure control order may request a hearing at which the order is reviewed, 8 C.F.R. § 215.4(a). At

the end of the administrative process, the order is either revoked or made final. Walter has never requested such a hearing; thus, the order affecting him has never become final.

**5.** The suit was originally filed as a class action but was amended in November 1980 to drop the class action allegation.

stitutional rights were violated as a result both of the issuance of the departure control order and of the adjustment of Walter's immigration status to that of permanent resident alien. In November 1983 Walter's motion to intervene was granted and he filed a counterclaim against his parents, alleging that their attempts to return him to the U.S.S.R. violated his rights under the U.S. and Illinois Constitutions. The counterclaim was dismissed as meritless in August 1984.

On July 17, 1985 the district court entered summary judgment for Michael and Anna Polovchak on the issue whether the procedure followed in issuing the departure control order denied due process and granted an injunction against enforcement of the departure control order. It is from this judgment that the government appealed. 28 U.S.C. § 1292(a)(1). As noted, the judgment was vacated and remanded by unpublished order of this court on September 10, 1985. It is important to our disposition that Walter becomes eighteen, and an adult under both Illinois and Soviet law, on October 3, 1985.

## II

This case raises issues in an unusual and sensitive area of the administration of federal immigration law. When a minor seeks political asylum over the objections of his family, his interest in choosing his own residence for political purposes is pitted against the right of parents to raise their child in the environment they deem proper. Family disputes are usually handled at the state level because of the special expertise of local agencies in matters of domestic relations. But here, because of the federal government's obligation to provide refuge to those threatened with political persecution, Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102, the rôle of mediation falls to the INS, an agency without any such special expertise. The primary question before us concerns what action the government must take to ensure that both parties, the parents and the child, receive an adequate opportunity to assert their interests.

■ Free personal choice in matters involving family life is a fundamental liberty interest of a parent, *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1981); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1971); *Ellis v. Hamilton,* 669 F.2d 510, 512 (7th Cir.1982), because "the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society," *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968).[6]

■ State intervention that results in the termination of that close parent-child relationship must adhere strictly to the requirements of procedural due process. *Santosky,* 455 U.S. at 753, 102 S.Ct. at 1394; *Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981); *Stanley,* 405 U.S. at 651, 92 S.Ct. at 1212; *Ellis,* 669 F.2d at 512. This case does not present quite so stark a scenario as the total severing of that relationship by the government: the departure control order merely prevented Walter from leaving the country; it did not prevent his parents from returning to Chicago and living with him there. But when the order was issued, the parents had already returned to their native country, and to condition their right to regain Walter on leaving it nonetheless significantly undercuts their liberty interest of family association. As for the grant of asylum, it too did not work a complete termination of parental rights; nonetheless, such an action has a divisive impact on family relations, especially (as here) if it is the predicate for further government action, such as the grant of resident alien status or the

---

**6.** The due process guarantees of the Fifth Amendment apply to resident aliens as well as to citizens. *Graham v. Richardson,* 403 U.S. 365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534 (1971); *Truax v. Raich,* 239 U.S. 33, 39, 36 S.Ct. 7, 9, 60 L.Ed. 131 (1915).

issuance of a departure control order.[7] In any event, we agree with the district court that Michael and Anna Polovchak have a "very strong interest," which was implicated in the matters of both the asylum and the departure control order and which has been treated rather cavalierly by the INS. It is not by any means controlling that Walter had been made a temporary ward of the state a few hours before his application for asylum was processed. The weighty parental interest in their child's well-being does not disappear merely because the parents have temporarily lost custody of their child. *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394. This rule is even more compelling in a case such as this, where the loss of custody was a circumstance of the same transaction that later deprived the parents of their due process rights.

■ Neither the notice nor the opportunity to be heard afforded the parents in regard to both the grant of asylum and the departure control order were of a sort consonant with the fundamental importance of the parents' interest in the residence, nurture and education of a minor child, then twelve or thirteen. The Polovchaks were never notified that Walter was applying for asylum,[8] and obviously no provision was made for a hearing. The government argues that the Polovchaks had actual notice of the proposed issuance of the departure control order from the brief that it filed in the Illinois Appellate Court (advising that such an order might be forthcoming) and actual notice from the papers filed in the district court for this lawsuit that the order

had been issued. The government also charges the Polovchaks with notice that a hearing regarding the departure control order was possible according to its own interpretation of the applicable regulation. The regulation itself only affords the affected alien a hearing, 8 C.F.R. § 215.3(b). Such notice is not sufficient, *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), especially in the hypothetical case envisioned by the agency's interpretation of its regulation—one in which the parents would be foreign nationals. In such a situation particularly, notice given by a filing in another court which further requires divining an agency's unwritten interpretation of its own regulation does not comport with the requirements of due process.

■ Under the balancing test laid out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), a court reviewing the process afforded by the government when a fundamental interest is at stake must weigh (a) the private interest affected by the proceeding and (b) the risk of error inherent in the government's chosen procedure against (c) the interest of the government in using its own procedure. Here, as we have said above, the parents' interest is one of the strongest our society knows. The risk of error in excluding the parents from either of the proceedings in question is great; the parents know the child—his motivation, his interests—better than any other party, save possibly the child himself. These interests would appear to dictate the service of formal notice on the parents of a

**7.** There appears to be some disagreement about the status under which Michael Polovchak brought his children into this country. Appellee says that they entered under the "parole" program, 8 U.S.C. § 1182(d)(5), under which the Attorney General may allow the entrance of certain foreign nationals for an indefinite period of time, although such entrants "shall not be regarded as ... alien[s]." *Id.* Intervenor points to the fact that the Polovchaks' immigration papers have the word "refugee" printed across the top. Since a grant of asylum confers refugee status, 8 U.S.C. § 1158, the significance of this debate is whether the grant of asylum altered Walter's legal residence status. We do not think that this is a material fact which must be

undisputed before summary judgment can enter. We focus instead on the potential and actual divisive impact of the asylum order on the family and on the parents' ability to raise their child as they see fit.

**8.** The government admits that it never advised the Polovchaks of Walter's asylum application. Intervenor Walter asserts that his attorney told his parents that the application would be filed. Assuming that this is true, such informal, oral notice would not comport with the requirements of due process. *Wolff v. McDonnell*, 418 U.S. 539, 563–64, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1973).

pending asylum application and of a proposed departure control order. It would also, absent a showing of great government necessity, appear to call for a hearing *before* the deprivation of parental rights, given the divisive impact of either government action on the family. *Fuentes v. Shevin*, 407 U.S. 67, 80–82, 92 S.Ct. 1983, 1994–95, 32 L.Ed.2d 556 (1972); *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

These procedures would burden the government only slightly. It is not likely that situations such as this would arise frequently. A post-deprivation hearing might be adequate where, for example, there was evidence of an emergency situation in which the government would have to protect its interest in safeguarding political refugees. In such circumstances, there might be justifiable concern that the minor would be spirited out of the country before the hearing could be held. But in the case before us at least, there was no evidence presented of such a possibility. Thus, the government's interest in its own procedures does not override the weighty interests of Walter's parents, interests that must prevail over all but the strongest countervailing interests. *Stanley*, 405 U.S. at 650, 92 S.Ct. at 1212.[9]

It was the obligation of the executive in this case to protect the rights of Michael and Anna Polovchak, not to defeat them, and therefore the district court's entry of summary judgment on this issue must be sustained.

### III

■ Although we agree with the district court that Walter's parents have been injured and must be afforded a remedy, we do not agree with the remedy that has been provided by the district court. Put more precisely, we do not believe that the district court weighed all of the proper considera-tions in reaching its decision as to a remedy. We agree that, as a practical matter, it is too late in the day to send the case back to the INS for the hearing which the Polovchaks never received. Thus, the judge did not abuse his discretion in deciding to invalidate the departure control order, as a substitute remedy for the hearing remedy that was no longer available. But an equitable remedy should be fashioned with the interests of *all* potentially affected persons in mind, and where we think the judge stepped over the bounds of his discretion was in failing to give any but the most perfunctory attention to Walter's rights.

The subject of the departure control order is a person who, though a minor, has constitutional rights that the government must respect. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969); *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Thus, we do not necessarily agree with the district court that the "private interest of . . . Walter . . . is by its very nature considerably less than that of his parents." Even if this were true in 1980 when Walter sought political asylum, Walter's rights have evolved over the past five years, and facts and circumstances relevant to such a balancing have changed.

At the age of twelve, Walter was presumably near the lower end of an age range in which a minor may be mature enough to assert certain individual rights that equal or override those of his parents; at age seventeen (indeed, on the eve of his eighteenth birthday), Walter is certainly at the high end of such a scale, and the question whether he should have to subordinate his own political commitments to his parents' wishes looks very different. The mi-

---

**9.** The present structure of a departure control order provides for the temporary issuance of such an order with the right in the alien subject to it to request a subsequent hearing. Although this seems generally to be an acceptable procedure, where a minor treated separately from his parents is involved, we think there should be a hearing (of which the parents have been formally notified) before any action is taken. As we have indicated, in an emergency the procedure may be appropriately modified.

nor's rights grow more compelling with age, particularly in the factual context of this case.

The ability of a young person to decide to which political system he professes allegiance necessarily increases with age. We do not suggest that every twelve year old entertains serious political views (although some may); we would, however, suggest that many seventeen year olds do. Similarly, as the child grows, his parents' influence over him weakens, and the time his parents have in which to guide him grows shorter. The district court may be correct that parents "have the right to bring up their children as atheists or Communists," but it is surely relevant that Walter has decided that he does not want to be a communist or an atheist and that his parents have only the few remaining days of his minority to try to change his mind. This consideration is of great importance here because, were Walter's parents to take him back to the Soviet Union before October 3, there is no evidence that he would be allowed to return to the United States as an adult on October 4 should his parents' influence fail.[10]

The district court also did not adequately weigh Walter's interest in avoiding the sanctions often imposed by the Soviets upon those who leave their country, refuse to return to it and publicly criticize it. We need not comment on the disputed admissibility of certain evidence that was before the district court on this point,[11] this court need not blind itself to the commonly recognized fact that Soviet citizens who refuse to return to the Soviet Union and publicly derogate that country are at risk of seriously adverse government action if they should involuntarily return to the U.S.S.R.[12] This, too, is a factor that might have changed over the past five years; it may well be that the danger of Soviet retribution aimed at returning critics of the

---

**10.** It is this factor—the finality of the decision and its grave and potentially irreversible consequences—that makes this case analogous to the Supreme Court decisions in which a minor's right to obtain an abortion over the objections of her parents was affirmed. In *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1978), the Court stressed that although "[l]egal restrictions on minors, especially those supportive of the parents' role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding," *id.* at 638–39, 99 S.Ct. at 3046, such "deference to parents" makes less sense in the face of a decision with such a "unique nature and consequences" as the abortion decision, *id.* at 643, 99 S.Ct. at 3048. "In sum, there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible." *Id.* at 642, 99 S.Ct. at 3048. *Accord Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1975).

Like the decision facing the minors in the abortion cases, Walter's decision is grave and unique. A minor seeking political asylum, if sufficiently mature, should have his wishes heard and taken into account.

With respect to Soviet law regarding emigration, see n. 12, *infra.*

**11.** The government offered the district court evidence in the form of a sworn statement by Leon Johnson, Director of the Office of Asylum Affairs, Bureau of Human Rights and Humanitarian Affairs, the State Department. It was Director Johnson's opinion that "if Walter were returned to the Soviet Union, it is highly probable that he would face imprisonment and/or internal exile, and almost certain that he would face severe forms of official harassment and discrimination." Appendix to Brief for Appellants at 121.

**12.** Leaving the country without authorization or refusing to return from abroad are crimes in the Soviet Union, as are anti-Soviet "agitation or propaganda" and "slanderous fabrications which defame the Soviet political and social system...." *See* Criminal Code of the RSFSR arts. 1, 70, in H. Berman & J. Spindler, Soviet Criminal Law and Procedure (1972). Violators of the criminal codes are sent to correctional institutions; political dissidents are also sometimes confined to psychiatric hospitals. Amnesty International, Prisoners of Conscience in the USSR: Their Treatment and Conditions (1980). On the criminal status of critics of Soviet society, see generally V. Chalidze, To Defend These Rights: Human Rights and the Soviet Union 115–48 (1974); A. Sakharov, Alarm and Hope 81–98 (1978); K. Klose, Russia and the Russians: Inside the Closed Society (1984).

There is always, of course, the possibility that the risk of retribution is not present in this case, but it cannot be so concluded from all that is before us. There have been no official representations about what sort of future Walter might anticipate if he returned to the Soviet Union.

regime would increase as the age of the speaker, and his perceived responsibility for his statements, increases.

## IV

Hence, we vacate the injunction and remand this case to the district court to prescribe an appropriate remedy. In weighing the equities, the district court will have to give close attention to the weighty parental interests of the senior Polovchaks, who were deprived of the nurture and education of their son by a process which, for all practical purposes, ignored them. But the court will also have to conscientiously consider Walter's interest in avoiding serious sanctions which might be imposed by the Soviet Union. A final factor to be considered is that only a few weeks remain of Walter's minority; Walter's age and the strength of the right he asserts—a right that will be unquestioned in a very short time—must be given considerable weight.

In order to weigh these respective interests of Walter and his parents, we believe an evidentiary hearing will be required. Although the district court has the discretion to again enjoin the departure control order, it would seem patently inequitable at this point to force a seventeen year old against his will to return to a country whose political values and methods he rejects and where he faces a threat of persecution. Thus, the district court might consider the possibility of entering an injunction with conditions that would protect Walter's interests. One such condition could be directed to insuring that Walter would leave this country only voluntarily were the departure control order lifted.[13] Conceding that voluntariness can be a fuzzy concept in parent-child relationships, such a condition should be the least restrictive of family autonomy as is possible while still protecting Walter's individual rights.

Although the reality is that time is running out on judicial (or administrative) proceedings before Walter becomes eighteen, we direct the district court to proceed as promptly as possible to determine an appropriate remedy for the due process violation that we have confirmed.

Walter's cross-appeal from a dismissal of his counterclaim is dismissed as premature. The only basis of the counterclaim that is seriously pressed is that under the Supremacy Clause of the Constitution the departure control order takes precedence over the Illinois court's custody order. As the district court may on remand again enjoin the departure control order, this issue may well become moot.

DISMISSED IN PART, VACATED AND REMANDED IN PART.

SWYGERT, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's holding that the Government's failure to properly notify Anna and Michael Polovchak of the possible issuance of the departure control order and to grant them a hearing before that order was issued violated Anna and Michael Polovchak's due process rights. I do not agree with the majority, however, that the district judge abused his discretion when he enjoined enforcement of the departure control order.

In my view, the only issue presented by this case is whether the Government violated the parents' due process rights when it entered the departure control order without giving the parents any opportunity to participate. Having found that the Government did violate the Polovchaks' rights, the district judge could and did properly find that the order was null and void. See Han-Lee Mao v. Brownell, 207 F.2d 142, 147 (D.C.Cir.1953). The entry of the permanent injunction was merely a mechanical (almost non-discretionary) method of enforcing this finding. Walter's rights to remain in this country were simply not at issue.

It is true that once the equitable powers of the court have been invoked, the district judge may consider the interests of all of the affected persons when fashioning the appropriate remedy; that does not mean, however, that the district judge does not

---

**13.** One example of such a condition would be a requirement that Walter be interviewed by someone in authority (for instance, an INS official) before he leaves the country.

grant the appropriate relief if he ignores or gives little weight to the interests of one affected person. In certain circumstances, such as in the instant case, the appropriate relief may require that those interests be ignored. Here, the district judge correctly found that a post-deprivation hearing today would be meaningless and would be tantamount to affording the parents no remedy at all because the facts and Walter's rights as they existed in 1982 could not be reconstructed. Thus, the only way to undo the manifest injustice wrought on the parents several years ago was to enjoin the order in its entirety. In addition, although the district judge did find that Walter's rights were less than those of his parents, a proposition with which I do not necessarily agree, it is clear that Walter would not suffer irreparable harm from the grant of the permanent injunction. He has another forum—a more appropriate one—where his rights, as they have developed since the departure control order was improperly entered, may be considered before his parents can return him to the Soviet Union. The majority correctly recognizes that in exceptional circumstances the Government may issue a temporary departure control order without granting a pre-issuance hearing so long as it provides a prompt post-issuance hearing. If Walter's situation today is as critical as he and the Government claim, then the Government could properly issue a temporary departure control order at this time, pursuant to 8 C.F.R. § 215.3(j), and then provide the parents with a prompt post-issuance hearing. That hearing before the administrative agency would be the appropriate forum for the consideration of Walter's present interests which are simply not relevant to the issue of whether the parents' rights were violated. Thus, in my

view, the district judge's grant of the permanent injunction did not constitute an abuse of discretion because it was the only meaningful relief that could have been granted to the parents and because Walter may have his rights promptly adjudicated elsewhere.

I concede that the approach I suggest is no less of a pyrrhic victory for the parents than is the approach of the majority, because the parents are not likely to have their rights considered in any proceeding before October 3, 1985, when the injunctive phase of this litigation becomes moot. Indeed, my approach sends Walter's parents back to the beginning of the administrative/judicial process, whereas the majority's approach merely remands the case to the district judge. Nonetheless, I believe that my approach is more sound because it does not permit the Government to continue to enforce an invalid order pending a hearing.[1] In addition, by ordering an evidentiary hearing on the balance of equities as they now exist, the majority in effect grants the relief that the Government has always suggested was appropriate—a post-deprivation hearing long after the original temporary order was issued. This conflicts with the majority's holding that in cases such as the one at bar where the Government has not demonstrated that exigent circumstances compelled its egregious behavior, the Government must provide the parents with a hearing before a departure control order is entered.

The impact of today's decision is probably not far reaching, at least domestically, due to the unique facts of this case. It is unlikely that the Government would ever attempt, or that a court would permit the Government, to grossly interfere by sum-

---

**1.** It is conceivable that under my approach Walter could be "whisked out" of the United States if the Government failed to grant a new order either before or soon after the mandate issued from our court. It seems unlikely, however, given the long and tortuous history of this case and the Government's decidedly strong preoccupation with the matter, that the Government would fail to act promptly. In addition, it is clear that the departure control order merely prohibits Walter's parents from taking him out of the country through legal means; nothing in

that order would prevent illegal means, such as kidnapping or drugging. Thus it is improbable, if not impossible, that the parents could return and enforce their legal rights before the Government had acted on Walter's behalf. Even if the parents could, I believe that the Government's behavior in this case is sufficiently inexcusable (and dangerous, *see discussion infra* at 739) that the very small risk that Walter might, through legal means, be returned against his will to the Soviet Union should be assumed.

mary procedures with American parents' decision about how and where to raise their children. *Cf. Schleiffer v. Meyers*, 644 F.2d 656, 665 (7th Cir.1981). But permitting the departure control order to stand notwithstanding its invalidity may have far broader or more dangerous implications for American families traveling or living abroad. There is nothing to deter foreign governments from engaging in retaliatory behavior other than our own government acting in accordance with acceptable legal principles. Thus, by invalidating the order in its entirety, this court would clearly inform other governments that our own government's cavalier approach to the rights of alien parents will not, under any circumstances, be condoned or permitted to succeed because of a delay in the judicial process.